UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
PATRICIA MEADORS, ANN MARIE LEGG,
NANCY REYES,and PATRICIA WATSON,
                                        Plaintiffs,                    **COMPLAINT**

                    -against-                                          Docket No.:

ULSTER COUNTY, PAUL J. VanBLARCUM
in his official capacity as Sheriff of the County of Ulster,
and individually, RICHARD BOCKELMANN,
in his official capacity as Sheriff of the County of Ulster
and individually, BRADFORD EBEL in his official
capacity as Superintendent of the Ulster County Jail
and individually, RAY ACEVEDO in his official capacity
as Deputy Superintendent of Ulster County Jail and individually,

                                        Defendants.

-----------------------------------------------------------------------X

        Plaintiffs, Patricia Meadors, Ann Marie Legg, Nancy Reyes, and Patricia Watson, by

their attorneys BONACIC, KRAHULIK, CUDDEBACK, McMAHON & BRADY, LLP hereby

complain of the Defendants as follows:

## THE PARTIES

        1.      Plaintiff Patricia Meadors (hereinafter "Plaintiff Meadors" or "Officer Meadors"),

is an individual who resides in the County of Ulster, State of New York.

        2.      Plaintiff Ann Marie Legg (hereinafter "Plaintiff Legg" or "Officer Legg"), is an

individual who resides in the County of Ulster, State of New York.

        3.      Plaintiff Nancy Reyes (hereinafter "Plaintiff Reyes" or "Officer Reyes"), is an

individual who resides in the County of Ulster, State of New York.

4.      Plaintiff Patricia Watson (hereinafter "Plaintiff Watson" or "Officer Watson"), is an individual who resides in the County of Ulster, State of New York.

5.      Upon information and belief, defendant Ulster County (hereinafter "Ulster County" or "Defendant"), is a political subdivision of the State of New York and exists in accordance with County Law of the State of New York.

6.      Upon information and belief, Ulster County maintains its principal office in Kingston, New York.

7.      Upon information and belief, Ulster County and is an employer defined by the relevant statutes in the State of New York.

8.      Upon information and belief, at the relevant times herein, Ulster County employed more than three-hundred (300) people at any given moment.

9.      Upon information and belief, the office of the Ulster County Sheriff (hereinafter "Sheriff") exists by virtue of Article 13 of the New York State Constitution.

10.     Upon information and belief, Ulster County Sheriff maintains its principal place of business in Kingston, New York, County of Ulster.

11.     Upon information and belief, defendant Richard Bockelmann was the Sheriff of Ulster County until replaced by the current Sheriff, Paul J. VanBlarcum.

12.     Upon information and belief, defendant Richard Bockelmann is an individual with a residence in the State of New York, County of Ulster.

13.     Upon information and belief, defendant Paul J. VanBlarcum is an individual with a residence in the State of New York, County of Ulster.

14.     Upon information and belief, defendant Bradford Ebel, is employed by the Ulster County Sheriff's Office, Corrections Division as the Superintendent.

15.     Upon information and belief, defendant Bradford Ebel is an individual with a residence in the State of New York, County of Ulster.

16.     Upon information and belief, defendant Ray Acevedo is employed by the Ulster County Sheriff's Office, Corrections Division as Deputy Superintendent.

17.     Upon information and belief, defendant Ray Acevedo is an individual with a residence in the State of New York, County of Ulster.

18.     Upon information and belief, defendant Paul Wesolowski, was employed by the Ulster County Sheriff's Office, Corrections Division.

## JURISDICTION AND VENUE

19.     Jurisdiction is based upon 28 U.S.C. § 1331, § 1343 and 42 U.S.C. §2000e et. seq., 42 U.S.C. §1983.

20.     Supplemental jurisdiction over New York State Executive Law §296 and other claims based upon New York State law are predicated upon 28 U.S.C. § 1367.

21.     Plaintiffs allege claims of sexual harassment, hostile work environment, gender discrimination, disparate impact, and disparate treatment that, as a result of the defendants' conduct, Defendants have jointly and severally violated federal and state law including 42 U.S.C. § 2000e et seq.

22.     Venue is based on the place of business of defendants and the location of the acts that form the basis of this complaint. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b).

-3-

23.     Plaintiffs filed charges of discrimination with the United States Equal

Employment Opportunity Commission claiming discrimination on the basis of gender, a sexually

hostile work environment, and retaliation.

24.     Plaintiffs received a determination after investigation of "Probable Cause" from

EEOC finding discrimination and retaliation occurred towards each of the Plaintiffs herein and

other women similarly situated.

25.     Plaintiffs received a Right to Sue Letter and have timely commenced this action

within ninety (90) days of receipt thereof.

## STATEMENT OF FACTS

26.     The claims hereinafter arise out of the same transaction, occurrence, or series of

transactions and/or occurrences, as well as common issues of law and fact. The Plaintiffs share a

common interest in obtaining the same and/or similar relief.

27.     A sexually hostile environment relating to all Plaintiffs herein, was known to exist

and accepted, either actually or constructively, by senior officers including, but not limited to,

former Sheriff Bockelmann, Sheriff Van Blarcum, Superintendents Brad Ebel, Deputy

Superintendent Ray Acevedo, Sgt. Michael Knox, Sgt. Christopher Ferro as well as Captains,

Lieutenants, Sergeants and Corporals employed by Defendants herein.

28.     Plaintiffs suffered discrimination, as hereinafter set forth, and engaged in

protected activity by complaining of the discrimination relating to their employment with the

defendants. As a result of those complaints, both jointly and severally, the Plaintiffs herein

suffered retaliation.

-4-

**The Facility**

29.     The Ulster County jail facility in which plaintiffs are employed is a responsibility of the Ulster County Sheriff, Paul J. Van Blarcum, who succeeded Richard Bockelmann in November 2006.

30.     The Sheriff employs correctional officers who are responsible for the safety, custody, control and movement of inmates confined to the Ulster County Jail. Such correctional officers are supervised by Corporals, Sergeants, Lieutenants, Captains, Deputy Superintendents and Superintendents.

31.     Both the previous Sheriff and the current Sheriff's designee as Superintendent is Defendant, Bradford Ebel. The Superintendent is supported by a Deputy Superintendent, Defendant Ray Acevedo. Defendant Acevedo designates the Lieutenants who are each responsible for one (1) of three (3) shifts, even though they all worked during the day.

32.     The Superintendent, Defendant Ebel is appointed by and is subordinate to the Ulster County Sheriff.

33.     The Superintendent, Defendant Ebel is responsible for corrections operations, budgeting, and planning.

34.     The Deputy Superintendent, Defendant Acevedo is the assistant to the superintendent and acts as warden of the facility known as Ulster County Jail.

35.     The Deputy Superintendent, Defendant Acevedo is subordinate to the superintendent.

36.     The shifts are known as "A Line" (midnight - 8:00 a.m.); "B Line" (8:00 a.m. - 4:00 p.m.) and "C Line" (4:00 p.m. - midnight). Each shift is supported by two (2) Sergeants

-5-

who are principally responsible for the jail during their shift.  Notwithstanding, on certain days a

Corporal will assume such responsibility.

37.     The position of Corrections Officer requires the individual corrections officers to

be locked inside the prison facility currently housing male inmates and female inmates.

38.     There are approximately one-hundred twenty three full-time (123) and

approximately thirty-nine (39) part-time male corrections officers and eighteen (18) female

corrections officers including part and full-time. The officers are dependent upon each other

within the facility for their own personal safety requiring immediate response from their co-

officers in situations of danger.

39.     Senior officers, a total of approximately 26,  are responsible for oversight

including corporals, sergeants, lieutenants, deputy superintendent and superintendent, all are men

except for two (2) woman, Corporals McCoy and DeCiccio who are first line supervisors.

40.     There are other "off line" superiors and elevated duty officers (approximately

twenty [20]), and none are women.

41.     Of the "off line" positions, there are other senior officers employed in

approximately ten (10) specialty units and none of them are women.  Within these specialty units

are teams, particularly the SERT (Sheriff's Emergency Response Team), Color Guard, K-9

Team and Dive Team, all consisting of men and totaling over twenty (20) positions.  Qualified

female officers, including Plaintiffs, sought these positions and were denied.

42.     Each shift has five (5) corporals as first line supervision.  A corporal is

designated to operate the jail on holidays when both sergeants have off, or when sergeants have

vacations.

-6-

43.     Corrections officers and male superiors frequently made, and continue to make through the present time, sexually offensive comments, jokes, innuendo, double entendre, pornography and sexual references to or about female officers and/or inmates. These include comments concerning woman's breasts, legs, buttocks, genitalia, sexual acts, solicitations and other unwelcomed and offensive conduct. As such conduct occurs both by and in front of senior officers, there is no reasonable avenue of complaint. Often times, women are implicitly, tacitly or directly compelled to tolerate or participate in such remarks or suffer negative consequences. Such negative consequences are both tacit as well as overt. Most important is the fear that a loss of comradery or support will result in a failure of a co-officer or supervisor to come to the aid of an officer in a dangerous situation.

**Gender Differences**

44.     At all relevant times herein, the Defendants were acting under color of state law by virtue of law enforcement authority under New York State Constitution, Article 13 and New York State Penal Law §265.20, with the right to carry weapons, and the control of the areas where the Plaintiffs work took place.

45.     Facilities are maintained in a gender disparate manner. Plaintiffs and other similarly situated female officers are required, frequently alone, to guard male inmates in showers, bathrooms and other private settings where there is an expectation the male inmates will be without clothing, partially undressed or engaged in bathroom activities. Conversely, male officers are not required to perform such duties with female inmates.

46.     Plaintiffs and other similarly situated female officers are required to guard approximately sixty (60) male inmates in "modules" where there is only one bathroom facility,

-7-

fully open to view. Consequently, female officers are required to observe male inmates using the facilities while themselves are unable to use facilities and they are not provided breaks for that purpose. Conversely, male officers do not perform similar responsibilities towards female inmates.

47.    Plaintiff and other similarly situated female officers are required to patrol male cell blocks without being paired with male officers. They are required to intervene when male inmates are engaged in masturbation or other sexual activity as well as other compromising situations. Conversely, male officers have none, or very limited, similar responsibility toward female inmates.

48.    As an example, Plaintiffs and other similarly situated female officers are required to "hook-up" male inmates by locking chains around the inmates' wrist in front of the inmates' waist while positioned behind the inmates. Men do not perform such functions toward female inmates.

49.    Plaintiffs and other similarly situated female officers are required to engage in physical conduct that requires close contact between female guards and male inmates. Conversely, male officers were not required to engage in similar conduct towards female inmates.

50.    The discriminatory conduct further extends to disparities in discipline and the disparate impact of rules and regulations related thereto upon women. Numerous male officers, including supervisors and even the deputy superintendent, after arrest and subsequent convictions of crimes or other violations are disciplined in a disparate manner from plaintiffs and other similarly situated female officers by superiors and supervisors in the jail.

Female officers are suspended or designated for termination while male officers are continued in employment or receive lesser discipline for similar violations.

51.     Defendants' gender discriminatory policies, practices and conduct also extended to advancement possibilities. Plaintiffs and other similarly situated female officers were denied promotional opportunities extended to male officers.  These included promotion to the position of Corporal, Sergeant, or higher as well as elevated duty officers and/or special teams.

52.     The discrimination further extends to disparities in work assignments including a disparate impact of the rules and regulations relating thereto upon women.  Such discrimination includes assignments, duties, responsibilities and positions. Women are not eligible or considered for promotion, often due to an historical failure to promote women, rendering them unqualified or ineligible to pursue higher positions. Additional examples include, but are not limited to, female officers are rarely designated as task officer, while male officers are routinely designated in such position despite having lesser qualifications or seniority. On the rare occassion when a female officer is assigned to such a position, she is left to do menial support tasks while other men in similar positions on the shift either fraternize with senior officers or do more appealing job assignments. Additionally, male officers are permitted to congregate in senior offices during shifts while female officers are required to perform duties and responsibilities that would otherwise be assigned to the men. On several ocassions, such congregations included looking at pornographic or sexually offensive material on the senior officers' computers. Additionally, pornographic material was maintained at work locations in drawers or cabinets utilized by women as well.

53.     Job assignments were further assigned in a disparate manner concerning officer

postings, responsibilities assigned in particular posts as well as breaks and leaves granted while on post.

**Hostile Work Environment**

54.　At all times preceding and during plaintiffs' employment, a severe and pervasive sexually hostile environment exists. This includes severe and pervasive sexual solicitations, jokes, comments, remarks and innuendo, both verbal and non-verbal and the presence of pornography.

55.　Such remarks were made by numerous male co-workers from the inception of plaintiffs' employment. These remarks were directed not only at the plaintiffs but towards and/or about other female co-workers and inmates. The comments and conduct frequently occurred in the presence and/or with the knowledge of superiors.

56.　Some of the officers who engaged in such conduct were promoted to senior positions. The officers who were promoted included Cpl. Paul J. Wesolowski, Corporal Wranovics, Sergeant Michael Knox, Sergeant Christopher Ferro, Sergeant Charles Polacco, Lieutenant John Becker, Deputy Superintendent Ray Acevedo and Superintendent Brad Ebel.

57.　Such conduct created a severe, pervasive, offensive, intimidating, hostile and discriminatory work environment for plaintiffs, other female officers and female employees. Plaintiffs and other similarly situated female officers and employees were subjected to repeated comments, jokes, innuendo, remarks and non-verbal communication of a sexual nature.

58.　Plaintiffs and other similarly situated female corrections officers and employees were shown lewd and pornographic photos and also numerous pornographic and lewd magazines which were left at duty stations or openly displayed.

-10-

**Retaliation**

59.     The hostile environment was maintained through actual and perceived threats of

retaliation.  Retaliation was directed by supervisors or co-workers for actual or perceived slights,

conflict or complaints.

60.     Superior officers made comments about the retaliation they condoned toward

subordinates.  The situation included imposing undesirable assignments, dangerous assignments,

unequal application of work rules, criticism, discipline or delay in responding to an emergency

call for assistance.

61.     By virtue of the interview, comments, conduct, condonation and ratification as

well as fear of retaliation, together with the "locked down" environment and need for co-worker

dependency, plaintiffs felt compelled and coerced into toleration and participation in the sexually

harassing environment.

62.     Retaliation further takes the form of disciplinary conduct known as "the burn".

"The burn" is an established practice of subjecting an officer to negative treatment including, but

not limited to, heightened scrutiny so as to impose discipline for minor offenses or performance

deficiencies that would otherwise not result in discipline. Additionally, "the burn" includes

negative work assignments, denial of leave, "silent treatment", and other demeaning treatment.

"The burn" is used as a form of retaliation by senior officers against corrections officers to

compel compliance or subjugation.

63.     By using the above described authority, the Defendants were able to maliciously

maintain, promote ratified and condoned a sexually severe, pervasive and hostile work

environment as well as perpetuate discrimination towards Plaintiffs and other women similarly

-11-

situated through a discriminatory effect and application of otherwise gender neutral employment rules, and regulations concerning the terms and conditions of employment.

## AS TO PLAINTIFF, PATRICIA MEADORS

64.     Plaintiff repeats and realleges each of the foregoing paragraphs as if set forth herein in full.

65.     Officer Meadors completed high school and took several college courses from 1993 to 1997 at Oklahoma State University and obtained her Bachelors of Science degree.

66.     Officer Meadors was first employed with Defendants in 2002 as a Corrections Officer and has maintained her employment through present.  During this time, she had taken exams for promotion to Corporal and Sergeant, achieved a satisfactory grade and was not offered promotion despite being qualified Plaintiff has remained a Corrections Officer without promotion through the present and has been discouraged from seeking promotion or assignment to elevated duty and/or special teams.

67.     Officer Meadors and other similiarly situated female officers were denied promotional opportunities extended to male officers.

68.     Officer Meadors applied for promotion to Corporal in March of 2007 and then to Sergeant in April of 2007 and on each occasion was denied and was passed over in favor of male officers.

69.     Officer Meadors was qualified to be promoted to Corporal and Sergeant following her successful completion of the Corporal and Sergeant exams respectively.  However, Officer Meadors was passed over for the benefit of male officers less qualified. Officer Meadors was qualified to be promoted to elevated duty as part of the SERT team and/or the K-9 team.

-12-

However, Officer Meadors was advised not to tryout, as Officer Meadors was told she would not be placed, and was passed over for the benefit of male officers less qualified. Other similarly situated female officers who were also eligible for promotion or for elevated duty have been denied.

70.     Officer Meadors has been denied numerous requests she has made to be task officer. Officer Meadors is senior to many of the male officers that are assigned task officers and is passed over purportedly because the assignment is primarily given to SERT members. If there are not enough SERT members, then primarily male officers are assigned.

71.     Officer Meadors was subjected to partially naked pictures and other pornographic materials on a frequent basis. Male supervisors have had a naked or partially clothed woman as a screen saver on their computers, and pornographic materials are left at duty stations.

72.     Officer Meadors suffered discrimination, as hereinafter set forth, and engaged in protected activity by complaining of the discrimination relating to her employment with the Defendants on numerous occasions, to officers and superiors, Sheriff Van Blarcum and Sergeant Eddie Torres.

73.     Officer Meadors is a lesbian. On numerous occasions, supervisors and other superiors would make sexual comments, jokes, and remarks to and in the vicinity of Officer Meadors and discuss sexual acts.

74.     Officer Meadors was subjected to sexually explicit stories regarding the sexual exploits of numerous officers, supervisors and other superiors.

75.     Officer Meadors would be subjected to sexual comments and statements, such as occasions when superior officers and supervisors were pointing out magazines or screen savers

-13-

depicting half naked women and state, "hey, Meadors, bet you can appreciate that", or "hey, I'd do her, would you do her?", making references to having sex with the females depicted on the screen.

76.     Officer Meadors is often subjected to sexual jokes and innuendos from male superiors and officers. As an example, this occurs when Officer Meadors has to strip-search a female inmate, the male officers and superiors make comments including, "oh, you're going to love this one, she's a real looker," or "bet you enjoyed that."

77.     Officer Meadors is fearful about complaining because she will be put on the "burn", which occurred following her identification as a witness on behalf of Plaintiff O'Bryan-Negron and her own Charge of Discrimination to the United States Equal Employment Opportunity Commission.

78.     Officer Meadors was targeted for harassment and discipline by superior officers and supervisors who learned of Officer Meador's high score on the officers' test. She was falsely accused of having a sexual relationship with a female inmate inside the jail. Upon information and belief, Lieutenant Jon Becker conducted the internal affairs investigation as head of the division. Lieutenant Becker was also one of the officers who conducted Officer Meadors' interview for Corporal. The false charge was subsequently dropped after a male officer, Jason Bleau, was promoted to the Corporal position that Officer Meadors had sought.

79.     Another incident occurred between Officer Meadors and Officer Robert Ferrara, where Officer Ferrara made a statement in front of several male officers, "what is the story with the bull-dyke lesbian?", referring to Officer Meadors. Officer Meadors subsequently reported the incident to a supervisor and, upon information and belief, Officer Ferrara recognizing the

-14-

violation of the written policies, approached the training coordinator to ask what he needed to do

not to be fired. However, no disciplinary action was taken against Officer Ferrara.

80.     In August of 2004, Officer Meadors requested and was denied time off and leave

consistent with the Family Medical Leave Act "FMLA" to assist her partner of five (5) years

who was in need of an operation. Such time off was typically granted, regardless of the person's

marital status.

81.     On February 2, 2006, female Officer Amy O'Bryan-Negron filed a Charge of

Discrimination with the United States Equal Employment Opportunity Commission. Plaintiff

Meadors was known to be a friend of Officer O'Bryan-Negron and was identified as a witness to

EEOC.

82.     On or about December 16, 2007, Officer Meadors received an emergency phone

call from home regarding her partner who had fallen and needed to go to the hospital. Officer

Meadors informed the supervisor that she needed to go home and was told there was no one to

relieve her, though there were at least four (4) task officers available during the shift who could

have relieved Officer Meadors. Such leave is typically granted to other officers.

83.     On June 20, 2008, Officer Meadors was scheduled to work at the reception area,

which is considered a desirable position but was removed and put in the female one-on-one

position instead, a much less desirable position with little to no breaks. On June 27, 2008,

Officer Meadors telephoned the watch commander at the jail to let them know she would not be

in and would be using a sick day. That same day, Sergeant Ferro telephoned Officer Meadors at

her home and berated her for calling in sick claiming she was not sick. Sergeant Ferro also

exclaimed to Officer Meadors during the aforementioned conversation that he had done her a

-15-

"favor" by switching her shift from "A line" to "C line" so she could work on her master's degree. Of course, such scheduling adjustments occurred for men who went to school or maintained second jobs. Also, by virtue of Meadors' longevity, she was entitled to a choice of shift. Upon information and belief, this was done in retaliation for Officer Meadors using a sick day.

84.     Officer Meadors was reluctant to complain about the sexually explicit material and the discriminatory and retaliatory treatment she faced in jail due to her previous experiences throughout her tenure regarding the lack of a good faith complaint procedure, investigation or corrective action. When women officers complained, including Officer Meadors, they were placed on "the burn", which included being treated in a negative manner, put on a single post watching male inmates without being able to move, as well as being isolated and would not be given breaks.

85.     Since being identified as a witness and subsequently filing her own EEOC Charge of Discrimination on July 11, 2008, Officer Meadors has been subjected to additional retaliation including shift changes to prevent Officer Meadors from attending school; denied leave which Officer Meadors was required to "use or lose" and lost such leave days; denied promotion to Corporal and/or Sergeant despite being qualified; denied assignment to Task Officer, and other negative conduct which continues to present.

86.     On November 26, 2008, the United States Equal Employment Opportunity Commission issued a Determination finding that the Plaintiffs and other similarly situated female employees were subjected to a hostile work environment including, but not limited to, severe and pervasive sexual harassment; that Defendants did not take reasonable care to prevent or correct

discrimination and harassment in the workplace; that Defendants violated Title VII of the Civil

Rights Act of 1964, as amended, by subjecting Plaintiffs and other similarly situated female

employees to a sexually hostile work environment; that Defendants retaliated against Plaintiffs,

and other similarly situated female employees by treating them differently, in retaliation for

opposing discrimination; assisting, testifying, or participating in the investigation; or having filed

a charge of discrimination with the EEOC; that Defendants Management knew or should have

known of the above described discrimination and harassment, but failed to appropriately

investigate and remedy the discrimination; that Plaintiffs and other similarly situated female

employees brought several complaints regarding the hostile, discriminatory and retaliatory

treatment and that the situation continued without remedy.

## AS TO PLAINTIFF, ANN MARIE LEGG

87.     Plaintiff repeats and realleges each of the foregoing paragraphs as if set forth

herein in full.

88.     Officer Legg completed high school and took several college courses from 1992

to 1993 and again from 1998 through 2002.

89.     Officer Legg began employment with Defendants in the winter of 1996 as a

Corrections Officer and has continued in that capacity to the present.

90.     In 2006, shortly before the jail was transitioned to the new facility, Officer Legg

requested, in a letter sent to Lieutenant Robert Scott, that Officer Legg continued to be interested

in being promoted to booking/intake.  Lt. Scott informed Officer Legg at that time that the jail

was not training anyone for booking.

91.     Officer Legg became aware at that time that two junior male officers thereafter

-17-

began training for booking/intake.

92.     The policy of the facility was to read a memo aloud at the line-up of each shift to let officers know of available positions.

93.     The memos read aloud at line-ups did not mention an open position in booking/intake from the time of Officer Legg's initial interest in the position until 2007.

94.     Conditions at the jail facility have deteriorated further since Defendant Sheriff Van Blarcum took office.  Officer Legg e-mailed several letters to Sheriff Van Blarcum regarding problems and issues with assignments, failures to recognize seniority, lack of promotions for females, the discriminatory and sexually hostile environment that exists because other senior officers and superiors would not relate the complaints to superiors or make any effort to take corrective action.

95.     Upon information and belief, several superiors have expressed to the Sheriff that Officer Legg is a "cry-baby bitch" and that is the only reason why she complains.

96.     As an example of disparate treatment and retaliation, Officer Legg was called into Sergeant Christopher Ferro's office and told she should not read on the job and to respect the rank, while another officer in the room, Jeffrey Breithaupt, was searching the internet and calling radio stations to enter contests during their meeting, which Officer Legg pointed out.  Sergeant Ferro then became loud and belligerent and stated that Officer Legg should look for another job.  Officer Legg was then dismissed from the room.

97.     Officer Legg was subjected to numerous sexual glares, comments, and innuendos relating to her physique, buttocks, and appearance.  These also included reference relating to her husband, such as, "oh, if you weren't married to Blaze".  Officer Legg's husband, "Blaze" is a

-18-

Corrections Officer at the Ulster County Jail facility as well. These same superiors and officers would often comment on Officer Legg's buttocks.

98.    Male officers often make comments in Officer Legg's presence regarding female inmates such as "Oh, I'd fuck her", and "I bet she looks good outside of her oranges" (a reference to the orange suits inmates wear) or other comments relating to breasts, legs, buttocks or physique.

99.    Male officers zoom in on visitor's breasts while they are sitting in the visitation area in front of Officer Legg and senior officers who took no action.

100.   An officer, after finding Plaintiff's cell phone, used same to take pictures of his genitalia and send to people in her address book. This also occurred to Plaintiffs Meadors and Watson, as well.

101.   During Officer Legg's first pregnancy, she suffered complications and asked for accommodation, which was granted for a light duty position without inmate contact. Shortly after, a urinal tablet was thereafter deliberately lodged into the heater coils and caused fumes that caused Officer Legg to become nauseous and she had to be taken to the hospital. Officer Legg believes this was done by a co-worker in retaliation.

102.   Officer Legg was fearful about complaining due to her knowledge of the lack of good faith complaint procedure, investigation or corrective action. She also feared she would be put on the "burn", which occurred following her initial complaints and being identified as a witness objecting to the discrimination practices of Defendants.

103.   Male officers and superiors retaliate frequently. A Sergeant addressed Officer Legg's husband and stated, "let your wife know she is on 'the burn' for a couple of days. Tell

-19-

her to deal with it."

104.    Male senior officers and superiors told Officer Legg's husband to "keep your wife in line" and to "control your wife".

105.    Corporal Wranovics yelled and cursed at Officer Legg on an occasion when Officer Legg went to talk to her shop steward because Corporal Wranovics made an unfounded claim that Officer Legg's post was not covered, even though it was covered by two (2) officers. Sergeant Winters had warned Officer Legg of retaliation and that what Officer Legg does can hurt her and her husband and she should be careful.

106.    Corporal Wranovics and other male superiors require Officer Legg to request permission to use the restroom facilities, while male officers do not have to request permission to use the facilities.

107.    On or about June 13, 2008, Officer Legg's husband, SERT Officer John Blaze Legg, informed Sergeant Christopher Ferro that Office Legg is pregnant and that she requests light duty due to her condition, *i.e.,* no Pod duty. Several male officers are afforded light-duty accommodations. Officer Legg's husband also stated at that time the Officer Legg would cooperate with any other assignment for as long as she was able.

108.    On or about June 16, 2008, Officer Legg also discussed her need for an accommodation with Sergeant Ferro.

109.    On or about July 8, 2008, Officer Legg had a conversation with Sergeant Ferro. Officer Legg had noticed she was assigned to work the Pods that day. Officer Legg asked Sergeant Ferro why she was assigned to the Pod and he claimed he did not recall the prior conversation with Officer Legg or her husband. Officer Legg worked the Pod that day. Officer

-20-

Legg noted in the logbook that day that she was told to work the Pod despite superiors and supervisors knowledge of Officer Legg's pregnancy. Sergeant Ferro telephoned Officer Legg during her shift and claimed that he would not be able to accommodate her until he gets "word from above." Sergeant Ferro then stated to Officer Legg that if she couldn't do the job, she should contact her union president. Officer Legg thereafter telephoned the union president and relayed her discussion with Sergeant Ferro and the union president informed Officer Legg that she needed to obtain a doctor's letter. However, other male officers with non-work related disabilities were provided non-inmate contact light duty positions.

110.    On or about July 8, 2008, Officer Legg requested an accommodation to not be assigned to work in the Pods due to her doctor's recommendation, that due to her pregnancy she have no direct inmate contact.

111.    On July 10, 2008, Officer Legg received the first general counseling of her career. A general counseling is the term used for a write-up within the corrections system. The counseling was related to Officer Legg's documentation of working an inmate residential "pod" while pregnant and was written by Corporal Charles M Wranovics. Upon receipt of the July 10, 2008 counseling letter, Officer Legg stated to Corporal Wranovics that her logbook entry of July 8, 2008 mentioned above, was related to the safety and welfare of herself and her unborn child. Officer Legg confirmed she made the log entry in question, as mentioned in the counseling letter, but did not in any way understand it to be a violation of Sheriff's Department policies and procedures. Corporal Wranovics did not permit Officer Legg to comment on the counseling letter. Officer Legg feels that this was done in retaliation for her participation and cooperation with Plaintiff Negron's complaint and for the initiation of her own complaint.

112.    On or about July 10, 2008 in the evening, Lieutenant Jon Becker contacted Officer Legg while off duty on her husband's cell phone and advised her that the Sheriff ordered her out of work. He also informed Officer Legg that she would not be permitted to return to work unless she provides documentation from her physician stating that she can return to work in full duty capacity. Officer Legg objected to Lieutenant Becker about the discriminatory conduct. Lieutenant Becker called again a few minutes thereafter and stated to Officer Legg that as long as she gets a revised letter stating she is pregnant and can work, he would "take care" of her.

113.    On or about July 11, 2008, Officer Legg received a letter from Undersheriff Frank P. Faluotico, Jr., explaining that Officer Legg would not be accommodated for her pregnancy and that if she could not perform full duty she could use accrued time to take off or file for disability.

114.    On July 14, 2008, Officer Legg filed a formal Charge of Discrimination with the United States Equal Employment Opportunity Commission.

115.    During Officer Legg's second pregnancy following such Charge she was berated when she asked for an accommodation and was told, "you expect us to take care of you. We weren't the ones to tell you to get knocked up."

116.    Lt. Becker and Sgt. Ferro are the superiors in charge of the elite Sheriff's Emergency Response Team (SERT). During training as part of his assignement to SERT, Officer Legg's husband was forced to run laps up and down the stairs because Officer Legg was out sick for a tubal rupture for almost a month. Her husband was required to run thirty (30) extra laps.

117.    Officer Legg was put on "the bum" for minor complaints so if Officer Legg were

-22-

to complain of sexual harassment or discrimination, Officer Legg believes the retaliation would be much worse.

118.    Officer Legg was denied light duty by Defendants and ordered to work alone in a male inmate housing unit. Defendants claimed light duty was only permitted to officers who were injured in the line of duty. Notwithstanding, male officers were granted light duty for non-work related disabilities including Donald Ostrander and Kent Ostrander. Plaintiff Legg was also provided a non-working "man down" device (used to notify other officers of an emergency if the officer becomes horizontal) despite her objections to the danger.

119.    On November 13, 2008, Officer Legg was again assigned to a male housing unit. A fight broke out in which Plaintiff Legg could not intervene and called for assistance. Plaintiff Legg was thereafter sent to the medical unit and was removed from service and ordered on compulsory disability.

120.    On November 26, 2008, the United States Equal Employment Opportunity Commission issued a Determination finding that the Plaintiffs and other similarly situated female employees were subjected to a hostile work environment including, but not limited to, severe and pervasive sexual harassment; that Defendants did not take reasonable care to prevent or correct discrimination and harassment in the workplace; that Defendants violated Title VII of the Civil Rights Act of 1964, as amended, by subjecting Plaintiffs and other similarly situated female employees to a sexually hostile work environment; that Defendants retaliated against Plaintiffs, and other similarly situated female employees by treating them differently, in retaliation for opposing discrimination; assisting, testifying, or participating in the investigation; or having filed a charge of discrimination with the EEOC; that Defendants Management knew

-23-

or should have known of the above described discrimination and harassment, but failed to appropriately investigate and remedy the discrimination; that Plaintiffs and other similarly situated female employees brought several complaints regarding the hostile, discriminatory and retaliatory treatment and that the situation continued without remedy.

## AS TO PLAINTIFF, NANCY REYES

121.   Plaintiff repeats and realleges each of the foregoing paragraphs as if set forth herein in full.

122.   Officer Reyes graduated from high school and thereafter attended training courses for corrections in Albany and yearly training thereafter as was required for corrections officers.

123.   Officer Reyes was first employed with Defendants in October, 1982, as a Corrections Officer and has maintained her employment through her recent wrongful termination.

124.   On numerous occasions, officers, supervisors and other superiors would make sexual comments, jokes and remarks to Officer Reyes and discuss sexual acts.

125.   Officer Reyes was subjected to sexually explicit stories regarding the sexual exploits of numerous officers, supervisors and other superiors.

126.   Officer Reyes complained to senior officers, including, but not limited to, Sergeant Knox in an attempt to alleviate the behavior but no discipline was taken and complaint procedures were not followed.

127.   Officer Reyes was subjected to sexually explicit lyrics in songs played by officers, superior officers and supervisors loudly throughout the zone offices. Some of the lyrics included, "suck me," "blow me,", "bend over," and "give me your booty."

-24-

128.    Officer Reyes was reluctant to complain about the sexually explicit material and the discriminatory and retaliatory treatment she faced in the jail due to her previous experiences throughout her tenure regarding the lack of a good faith complaint procedure investigation or corrective action. When women officers complained, they were placed on "the burn", treated differently, put on a single post watching male inmates without being able to move, as well as being isolated and would not be given breaks.

129.    Officer Reyes, on March 5, 2008, complained of chest pains and the nurse put her on an EKG monitor and informed her supervisor of her condition and recommended to him along with the doctor that Officer Reyes go to the hospital. The Sergeant delayed in providing adequate medical care to Officer Reyes, who was subsequently admitted hours later to the hospital for chest pains and possible heart attack, after complaining of her trouble. The male Duty Sergeant stated that the only way he could get her to the hospital was with a female officer and accompanied by an inmate who also needed treatment. This was against protocol.

130.    A similar incident occurred shortly thereafter the same Sergeant experienced heart trouble and was transported to the hospital by an Officer, who had also been available when Officer Reyes experienced chest pains as well, within ten (10) to fifteen (15) minutes after the sergeant first felt ill.

131.    Officer Reyes complained about the sergeant not filling out a "C2" form concerning her work-related injury and had to complain to Lieutenant Russo, who then filled out her C2 form and informed Officer Reyes that he had instructed the sergeant to fill out the appropriate paperwork. Three (3) days after the aforementioned complaint, Officer Reyes was suspended.

-25-

132.   On July 2, 2008, Officer Reyes filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission.

133.   Officer Reyes was subsequently involved in a domestic dispute with her husband outside the workplace.  She was then suspended and designated for termination.  However, male officers have had similar disputes or arrests for more egregious conduct but were not suspended or terminated.

134.   On October 12, 2008, an arbitrator who had been appointed to Plaintiff Reyes' Article 75 hearing, and determined Plaintiff Reyes should be suspended sixty (60) days and otherwise restored to her position with back pay.

135.   Defendant Sheriff Van Blarcum thereafter rejected the arbitrator's decision and terminated Plaintiff Reyes from employment, though similarly situated male officers and superior officers were not subjected to similar discipline.

136.   On November 26, 2008, the United States Equal Employment Opportunity Commission issued a Determination finding that the Plaintiffs and other similarly situated female employees were subjected to a hostile work environment including, but not limited to, severe and pervasive sexual harassment; that Defendants did not take reasonable care to prevent or correct discrimination and harassment in the workplace; that Defendants violated Title VII of the Civil Rights Act of 1964, as amended, by subjecting Plaintiffs and other similarly situated female employees to a sexually hostile work environment; that Defendants retaliated against Plaintiffs, and other similarly situated female employees by treating them differently, in retaliation for opposing discrimination; assisting, testifying, or participating in the investigation; or having filed a charge of discrimination with the EEOC; that Defendants Management knew or should have

-26-

known of the above described discrimination and harassment, but failed to appropriately

investigate and remedy the discrimination; that Plaintiffs and other similarly situated female

employees brought several complaints regarding the hostile, discriminatory and retaliatory

treatment and that the situation continued without remedy.

## AS TO PLAINTIFF, PATRICIA WATSON

137.    Plaintiff repeats and realleges each of the foregoing paragraphs as if set forth

herein in full.

138.    Officer Watson completed high school and further received an associate's degree

in Criminal Justice from Ulster County Community College in 1998 and her bachelor's degree in

Criminal Justice from Northern Arizona University in May 2000.

139.    Officer Watson began employment with Defendants in July 2000 as a Corrections

Officer and has continued in that capacity to the present.

140.    On numerous occasions, officers, supervisors and superiors would made sexual

comments to Officer Watson and discuss sexual acts.

141.    Officer Watson made complaints of discrimination and sexual harassment

regarding Officer Divorl to her superiors, as did Officer Amy Negron on her behalf, concerning

the treatment Officer Watson suffered from Officer Divorl. These included frequent sexual

comments and innuendos.  As an example, Officer Divorl had a vibrating chair and would say to

Officer Watson, "I can feel my balls vibrating", and other similar remarks. The day after Officer

Negron made the complaint on Officer Watson's behalf, Officer Watson was put on a transport

detail alone with Office Divorl.

142.    Officer Watson objected to several corporals regarding being assigned with

-27-

Officer Divorl in booking, and mentioned to them that Officer Divorl made her uncomfortable, that she was required to work with him. Officer Watson was told to "deal with it". Officer Divorl continued his activities towards Officer Watson, including making comments concerning Playboy magazines that he had in his possession on the post.

143.   An officer, after finding Plaintiff Watson's cell phone, used same to take pictures of his genitalia and sent the photo to all the people in her address book. This had occurred towards other female officers as well.

144.   These activities continued for almost three (3) years until Officer Watson could not tolerate it any more. Officer Watson went to a corporal, who then took it to Sergeant Polacco, who then took it to Lieutenant Becker. Officer Watson then had a meeting with Lieutenant Becker and Office Divorl where Officer Watson expressed that she wanted the conduct to end.

145.   As a result of Officer Watson's complaints, she was reduced from working intake from five (5) days a week to three (3) days a week instead. This caused Officer Watson to work a less desirable position on the two (2) days that she would normally be in intake. Officer Watson complained about the demotion and was told it was to rotate people around.

146.   Officer Divorl was still not removed from the intake area where Officer Watson works and was assigned to work with her on several days thereafter. He was only removed from the intake area after he had a separate, unrelated confrontation with a male officer, Officer Warren Whitaker.

147.   Supervisors, superiors, and other male officers make personal contact with female officers that Officer Watson felt was sexually harassing, at least a few times a week. Male

-28-

officers often go up to female officers and hug them, kiss their cheek, and rub their shoulders. Though such conduct is unwelcome, and Officer Watson has expressed same in the past, the actions continue. On such occasions, it became clear that objection or complaint was purposeless and results only in retaliatory response.

148.    On July 14, 2008, Officer Watson filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission.

149.    Following her Charge of Discrimination, Officer Watson was subsequently removed from her Intake post and reassigned. She subsequently suffered an injury and compelled to utilize disability leave instead.

150.    On November 26, 2008, the United States Equal Employment Opportunity Commission issued a Determination finding that the Plaintiffs and other similarly situated female employees were subjected to a hostile work environment including, but not limited to, severe and pervasive sexual harassment; that Defendants did not take reasonable care to prevent or correct discrimination and harassment in the workplace; that Defendants violated Title VII of the Civil Rights Act of 1964, as amended, by subjecting Plaintiffs and other similarly situated female employees to a sexually hostile work environment; that Defendants retaliated against Plaintiffs, and other similarly situated female employees by treating them differently, in retaliation for opposing discrimination; assisting, testifying, or participating in the investigation; or having filed a charge of discrimination with the EEOC; that Defendants Management knew or should have known of the above described discrimination and harassment, but failed to appropriately investigate and remedy the discrimination; that Plaintiffs and other similarly situated female employees brought several complaints regarding the hostile, discriminatory and retaliatory

-29-

treatment and that the situation continued without remedy.

## AS TO THE CLAIMS OF ALL PLAINTIFFS AS AGAINST DEFENDANTS, ULSTER COUNTY, PAUL J. VanBLARCUM, RICHARD BOCKELMANN, BRADFORD EBEL, and RAY ACEVEDO:

## AS AND FOR A FIRST CAUSE OF ACTION OF DISCRIMINATION AS AGAINST DEFENDANTS, ULSTER COUNTY, PAUL J. VanBLARCUM, RICHARD BOCKELMANN, BRADFORD EBEL, and RAY ACEVEDO

151.    By reason of the foregoing, defendants have violated the Civil Rights Laws of the United States as set forth in 42 U.S.C. §2000e et seq.

152.    By virtue of the discriminatory, harassing, reckless, wrongful, willful and malicious treatment of the plaintiff by the defendants because of plaintiffs' gender and the denial of equal opportunity, terms, conditions, and perquisites of employment the defendants violated the laws of the United States as set forth in 42 U.S.C. §2000e et seq.

153.    As a result of defendants' discriminatory, harassing, reckless, unlawful, wanton and malicious conduct and the sexually hostile environment plaintiffs were both jointly and severally suffered discrimination in violation of 42 U.S.C. §2000e et seq., including non-economic and economic damages.

154.    By virtue of the foregoing, plaintiffs both jointly and severally seek affirmative relief which may include, but is not limited to, requiring Defendants to post the avenues to address complaints of workplace harassment, discrimination, and retaliation, requiring defendant's employees and defendants to undergo sexual harassment, discrimination and retaliation training, and any other equitable relief as the Court deems appropriate, compensatory damages, attorneys fees, costs and disbursements of this action.

155.    By reason of defendants' conduct and their violation of 42 U.S.C. §2000e et seq., plaintiff is entitled, front pay, back pay, compensatory damages, punitively damages for emotional distress, attorney's fees, costs and disbursements and any other remedy to which the plaintiffs, jointly and severally, may be entitled by statute or which the Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION OF HOSTILE WORK ENVIRONMENT AS AGAINST ALL DEFENDANTS, ULSTER COUNTY, PAUL J. VanBLARCUM, RICHARD BOCKELMANN, BRADFORD EBEL, and RAY ACEVEDO

156.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if more fully set forth herein.

157.    By reason of the foregoing, defendants have violated the Civil Rights Laws of the United States as set forth in 42 U.S.C. §2000e et seq.

158.    The discriminatory, harassing, reckless, wrongful, willful and malicious treatment of the plaintiffs both jointly and severally by the defendants because of gender and the denial of equal opportunity, terms, conditions, and perquisites of employment created a hostile work environment of sexual harassment and were in violation thereof.

159.    As a result of defendants' discriminatory, harassing, reckless, unlawful, wanton and malicious conduct and the sexually hostile environment plaintiffs, both jointly and severally, were forced to endure, each suffered emotional, non-economic and economic damage.

160.    Plaintiff seeks affirmative relief which may include, but is not limited to, requiring Defendants to post the avenues to address complaints of workplace harassment, discrimination, and retaliation, requiring defendant's employees and defendants to undergo

-31-

sexual harassment, discrimination and retaliation training, and any other equitable relief as the Court deems appropriate.

161.    By reason of defendants' conduct, plaintiff is entitled to front pay, back pay, compensatory damages, punitive damages for emotional distress, attorney's fees, costs and disbursements or any other remedy to which the plaintiffs, both jointly and severally, may be statutorily entitled or which the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION OF DISPARATE IMPACT DISCRIMINATION AS AGAINST DEFENDANTS, ULSTER COUNTY, PAUL J. VanBLARCUM, RICHARD BOCKELMANN, BRADFORD EBEL, and RAY ACEVEDO

162.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if more fully set forth herein.

163.    By reason of the foregoing, defendants have violated the Civil Rights Laws of the United States as set forth in 42 U.S.C. §2000e et seq.

164.    The discriminatory, harassing, reckless, wrongful, willful and malicious treatment of the plaintiffs, both severally and jointly, by the defendants resulting in a disparate impact due to gender and the denial of equal opportunity, terms, conditions, and perquisites of employment to female correction officers similarly situated.

165.    As a result of defendants' discriminatory, harassing, reckless, unlawful, wanton and malicious conduct and the sexually hostile environment plaintiff was forced to endure, she suffered non-economic and economic damages.

166.    Plaintiffs, both jointly and severally, seek affirmative relief which may include, but is not limited to, requiring Defendants to post the avenues to address complaints of

-32-

workplace harassment, discrimination, and retaliation, requiring defendant's employees and defendants to undergo sexual harassment, discrimination and retaliation training, and any other equitable relief as the Court deems appropriate.

167. By reason of defendants' conduct, plaintiff is entitled to front pay, back pay, compensatory damages, punitive damages for emotional distress, attorney's fees, costs and disbursements of this action and any other remedy to which the plaintiffs, both jointly and severally, may be entitled by statute or which the Court seems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION OF RETALIATION AS AGAINST DEFENDANTS, ULSTER COUNTY, PAUL J. VanBLARCUM, RICHARD BOCKELMANN, BRADFORD EBEL, and RAY ACEVEDO

168. Plaintiffs repeat and reallege each of the foregoing paragraphs as if more fully set forth herein.

169. By reason of the foregoing, defendants retaliated against plaintiffs, both jointly and severally, and violated Civil Rights Laws of the United States as set forth in 42 U.S.C. §2000e *et seq.*

170. The harassing, reckless, wrongful, willful and malicious treatment of the plaintiffs, both jointly and severally, by the defendants solely because plaintiffs, both jointly and severally, made complaints of discrimination and objected to discriminatory conduct and/or participated in a claim of discrimination, or were a witness to discrimination; constitutes denial of equal opportunity, terms, conditions, and perquisites of employment and is retaliation with the meaning of the law of the United States violating 42 U.S.C. §2000e *et seq.*

171. As a result of defendants' harassing, reckless, unlawful, wanton and malicious

-33-

retaliatory conduct plaintiffs, both jointly and severally, suffered non-economic and economic damages.

172.   Plaintiffs seeks affirmative relief which may include, but is not limited to, requiring Defendants to post the avenues to address complaints of workplace harassment, discrimination, and retaliation, requiring defendant's employees and defendants to undergo sexual harassment, discrimination and retaliation training, and any other equitable relief as the Court deems appropriate.

173.   By reason of the defendants' retaliatory conduct, plaintiffs, both jointly and severally, are entitled to front pay, back pay, compensatory damages, punitive damages, damages for emotional distress, attorney's fees, costs and disbursements of this action and such other and further relief as plaintiffs, both jointly and severally, may be entitled by statute or which the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION OF NEW YORK STATE EXECUTIVE LAW § 296 et seq. –DISCRIMINATION- AS AGAINST DEFENDANTS, ULSTER COUNTY, PAUL J. VanBLARCUM, RICHARD BOCKELMANN, BRADFORD EBEL, and RAY ACEVEDO**

174.   Plaintiffs repeat and reallege each of the foregoing paragraphs as if set forth herein in full.

175.   By reason of the foregoing, the discriminatory treatment of plaintiffs, both jointly and severally, by defendants was due, in whole or in part, to gender, in violation of the Human Rights Law of the State of New York §296, et seq.

176.   The discriminatory, harassing, reckless, wrongful willful and malicious treatment of the plaintiffs, both jointly and severally, by defendants because of gender, and the denial of

-34-

equal opportunity, terms, conditions, and perquisites of employment were in violation thereof.

177.  As a result of defendants' discriminatory, harassing, reckless, unlawful, wanton and malicious conduct, plaintiffs, both jointly and severally, suffered emotional, non-economic and economic damage.

178.  By reason of defendants' conduct, plaintiffs, both jointly and severally, are entitled, but not limited to, back pay, compensatory damages, damages for emotional distress, costs and disbursements or any other remedy to which she may be entitled by relevant statute.

## AS AND FOR A SIXTH CAUSE OF ACTION – NEW YORK STATE EXECUTIVE LAW §296 *et seq.*- RETALIATION - AS AGAINST DEFENDANTS, ULSTER COUNTY, PAUL J. VanBLARCUM, RICHARD BOCKELMANN, BRADFORD EBEL, and RAY ACEVEDO

179.  Plaintiffs repeat and reallege each of the foregoing paragraphs as if set forth herein in full.

180.  By reason of the foregoing, the discriminatory treatment of plaintiffs, both jointly and severally, by defendants was due, in whole or in part, to retaliation, in violation of the Human Rights Law of the State of New York §296 *et seq.*

181.  The harassing, reckless, wrongful willful and malicious treatment of the plaintiffs, both jointly and severally, by Defendants, and the denial of equal opportunity, terms, conditions, and perquisites of employment were retaliatory for plaintiffs, both jointly and severally, having engaged in protected conduct.

182.  As a result of defendants' harassing, reckless, unlawful, wanton and malicious retaliatory conduct plaintiffs, both jointly and severally, suffered emotional, non-economic and economic damage.

-35-

183.    By reason of defendants' retaliatory conduct, plaintiffs, both jointly and severally, are entitled, but not limited to back pay, compensatory damages, damages for emotional distress, costs and disbursements or any other remedy to which she may be entitled by relevant statute.

## AS AND FOR A SEVENTH CAUSE OF ACTION –VIOLATION OF 42 U.S.C. 1983- AS AGAINST DEFENDANTS, ULSTER COUNTY, PAUL J. VanBLARCUM, RICHARD BOCKELMANN, BRADFORD EBEL, and RAY ACEVEDO

184.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if set forth herein in full.

185.    By reason of the foregoing, defendants' discriminatory treatment of plaintiffs, both jointly and severally, was in violation of 42 U.S.C. §1983.

186.    As a result thereof, plaintiffs, both jointly and severally, suffered various severe injuries and damages.

187.    By reason thereof, plaintiffs are entitled, but not limited to back pay, compensatory damages, damages for emotional distress, attorney's fees, costs and disbursements or any other remedy to which the Court may deem just and proper.

188.    Plaintiffs, both jointly and severally, seek affirmative relief which may include, but is not limited to, requiring Defendants to post the avenues to address complaints of workplace harassment, discrimination, and retaliation, requiring defendant's employees and defendants to undergo sexual harassment, discrimination and retaliation training, and any other equitable relief as the Court deems appropriate, compensatory damages; attorney's fees; costs and disbursements.

189.    By reason of the defendants' conduct, plaintiffs, both jointly and severally, are entitled to back pay, compensatory damages, pension contribution, punitive damages, damages

-36-

for emotional distress, front pay, costs and disbursements and such other relief as each may be entitled.

## AS AND FOR A EIGHTH CAUSE OF ACTION – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS- AS AGAINST DEFENDANTS, ULSTER COUNTY, PAUL J. VanBLARCUM, RICHARD BOCKELMANN, BRADFORD EBEL, and RAY ACEVEDO

190.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if set forth herein in full.

191.    By reason of the foregoing, defendants treatment of plaintiff, both jointly and severally, constituted negligent infliction of emotional distress.

192.    As a result thereof, plaintiffs, both jointly and severally, suffered severe emotional distress and has incurred damages thereby, in a sum to be determined at trial.

193.    By reason thereof, plaintiffs, both jointly and severally, are entitled, but not limited to back pay, compensatory damages, damages for emotional distress, attorney's fees, costs and disbursements or any other remedy to which each may be entitled.

## AS TO THE CLAIMS OF PLAINTIFF, ANN MARIE LEGG, ONLY:

## AS AND FOR A NINTH CAUSE OF ACTION OF PREGNANCY DISCRIMINATION AS AGAINST DEFENDANTS, ULSTER COUNTY, PAUL J. VanBLARCUM, RICHARD BOCKELMANN, BRADFORD EBEL, and RAY ACEVEDO –

194.    Plaintiff repeats and realleges each of the foregoing paragraphs as if set forth herein in full.

195.    Plaintiff Ann Marie Legg suffered discrimination and retaliation based upon her pregnancy in violation of the Civil Rights Laws of the United States as set forth in 42 U.S.C. §2000e et seq.

-37-

196.     By reason of defendants' conduct, plaintiff is entitled, back pay, compensatory damages, punitive damages, damages for emotional distress, attorney's fees, costs and disbursements or any other remedy permitted by relevant statute to which the Court seems just and proper.

**AS AND FOR A TENTH CAUSE OF ACTION, ON BEHALF OF PLAINTIFF LEGG, OF  NEW YORK STATE EXECUTIVE LAW §296 *et seq.*, -PREGNANCY DISCRIMINATION AS AGAINST DEFENDANTS, ULSTER COUNTY, PAUL J. VanBLARCUM, RICHARD BOCKELMANN, BRADFORD EBEL, and RAY ACEVEDO**

197.     Plaintiff repeats and realleges each of the foregoing paragraphs as if set forth herein in full.

198.     Plaintiff Ann Marie Legg suffered discrimination and retaliation based upon her pregnancy in violation of the Human Rights Law of the State of New York §296 et seq..

199.     By reason of defendants' conduct, plaintiff is entitled, back pay, compensatory damages, damages for emotional distress, costs and disbursements or any other remedy permitted by relevant statute to which the Court seems just and proper.

WHEREFORE, plaintiff demands judgment in her favor and against the defendants for all wages, other compensation and lost benefits through the time of judgment, for compensatory damages, for lost pension benefits, for emotional distress, for the reasonable attorney's fees incurred in the prosecution of this action, for punitive damages, for the costs of this action to be taxed against the defendants, and for such other relief as the court deems appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury.

-38-

Dated: May 11, 2009
      Middletown, New York

_____
Joseph J. Ranni, Esq. (JR-8537)
Bonacic, Krahulik, Cuddeback,
   McMahon & Brady, LLP
Attorneys for the Plaintiffs
90 Crystal Run Road, Suite 104
Middletown, New York 10941
(845) 703-3101