**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**ANN MARIE LEGG; NANCY REYES;**
**PATRICIA WATSON,**

                              **Plaintiffs,**

              **v.**                                              **1:09-CV-550**
                                                                  **(FJS/RFT)**

**ULSTER COUNTY; PAUL J. VANBLARCUM,**
**in his official capacity as Sheriff of the County of**
**Ulster and individually; RICHARD BOCKELMANN,**
**in his official capacity as Sheriff of the County of Ulster**
**and individually; BRADFORD EBEL, in his official**
**capacity as Superintendent of the Ulster County Jail and**
**individually; and RAY ACEVEDO, in his official capacity as**
**Deputy Superintendent of Ulster County Jail and**
**individually,**

                              **Defendants.**

_____

**APPEARANCES**                          **OF COUNSEL**

**KLAPROTH LAW PLLC**                    **BRENDAN J. KLAPROTH, ESQ.**
406 5th Street, NW
Suite 350
Washington, D.C. 20001
Attorneys for Plaintiffs

**RANNI LAW FIRM**                       **JOSEPH J. RANNI, ESQ.**
148 North Main Street
Florida, New York 10921
Attorneys for Plaintiffs

**BERGSTEIN & ULRICH, LLP**      **STEPHEN BERGSTEIN, ESQ.**
5 Paradies Lane
New Paltz, New York 12561
Attorneys for Plaintiffs

**ROEMER WALLENS GOLD &**      **EARL T. REDDING, ESQ.**
**MINEAUX LLP**      **MATTHEW J. KELLY, ESQ.**
13 Columbia Circle
Albany, New York 12203
Attorneys for Defendants

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Pending before the Court are the parties' proposed findings of fact and conclusions of law with regard to Plaintiff Legg's disparate impact claim pursuant to the Pregnancy Discrimination Act[1] ("PDA").  *See* Dkt. Nos. 191, 192.

### II. BACKGROUND

Plaintiff Legg was a corrections officer at the Ulster County Jail and, on May 11, 2009, she filed this lawsuit along with three other corrections officers, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), New York State Human Rights Law ("NYSHRL"), and 42 U.S.C. § 1983.  Among various other claims, Plaintiff Legg asserted claims of pregnancy

---

[1] The PDA added a definitional provision to Title VII, which provided, in relevant part, that

> [t]he terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy . . .; and women affected by pregnancy, . . . shall be treated the same for all employment-related purposes, . . . as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k).

discrimination against all Defendants under the PDA and state law. The basis for her claim was that Defendants denied her request for light-duty assignments during her pregnancy, and she was consequently required to work directly with inmates.

On January 7, 2011, Defendants filed a motion for summary judgment arguing that Plaintiffs' claims failed for various reasons. *See* Dkt. No. 29. In a Memorandum-Decision and Order, the Court dismissed several of Plaintiffs' claims. However, the Court determined that a trial was necessary to adjudicate, among others, Plaintiff Legg's PDA claim against Defendant County. *See generally* Dkt. Nos. 55, 98.

After Plaintiffs presented their case-in-chief, Defendants moved for a directed verdict on all of Plaintiffs' claims, including Plaintiff Legg's PDA claim. The Court granted Defendants' motion as to Plaintiff Legg's PDA claim after concluding that Defendants' light-duty policy was applied neutrally to all employees and, thus, could not form the basis for a PDA claim. *See* Dkt. No. 101; *see also* Dkt. No. 165 at 613-15.

Plaintiff Legg appealed to the Second Circuit Court of Appeals, arguing that the Court had erred in dismissing her PDA claim. *See* Dkt. Nos. 113. The Second Circuit first noted that, while the appeal was pending, the Supreme Court had held in *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338 (2015), "that an employer's facially neutral accommodation policy gives rise to an inference of pregnancy discrimination if it imposes a significant burden on pregnant employees that is not justified by the employer's non-discriminatory explanation." *Legg v. Ulster Cty.*, 820 F.3d 67, 70 (2d Cir. 2016). Therefore, based on this new controlling precedent, the Second Circuit vacated the Court's directed verdict regarding Plaintiff Legg's PDA claim and instructed the Court to hold a new trial.

The Court thereafter held a trial regarding Plaintiff Legg's PDA claim. In that regard, the Court bifurcated the case to allow a jury to decide whether Plaintiff had established a disparate treatment claim[2] and directed the parties to file proposed findings of fact and conclusions of law with respect to Plaintiff Legg's disparate impact claim.

### III. DISCUSSION

**A.    Findings of fact**

*1. The Ulster County jail and posts available[3]*

The Ulster County Jail ("Jail") has three shifts, A Line, B Line, and C Line. *See* Dkt. No. 194 at 3. In 2008, correction officers did not bid for their posts but were allowed to bid on their shifts. *See id*. at 79. With regard to posts, Sergeant Ferro and Corporal Reeves had discretionary authority to prepare the schedule. *See id*. at 8-9. Officers were therefore rotated to posts throughout the Jail. *See id.* at 163. In 2008, Plaintiff was qualified to work any position in the Jail. *See* Dkt. No. 195 at 16.

The Jail had eight Pods, each of which was a 48-cell housing unit that housed up to 60 inmates. *See* Dkt. No. 194 at 9. In each Pod, inmates were able to walk freely and socialize in a common area. *See id*. at 10. A-Pod housed 16-18 year-old men. *See id.* at 11. B-Pod housed rapists, sex offenders, and suicide risks. *See id*. at 18-22. C-Pod housed "maximum security" male inmates, who had committed dangerous crimes. *See id*. at 12. D-Pod, G-Pod and I-Pod housed male inmates in the general population. *See id*. at 12-14. F-Pod housed female inmates. *See id*. at 13. H-Pod housed disciplinary/classification male inmates. *See id*. at 13. Dorm 2 was

---

[2] The jury found that Plaintiff had failed to establish a disparate treatment claim.

[3] This section largely adopts Plaintiff's uncontradicted recitation of the facts.

a smaller male housing unit that included a bathroom.  *See id*. at 14-15.  One correction officer supervised each Pod as well as Dorm 2.  *See id*. at 11, 15.  In these Pods and Dorm 2, the correction officer had direct contact with inmates.  *See id*. at 14, 16, 152.

Correction officers had more limited inmate contact in Medical, K-Pod and Dorm 1.  *See id*. at 22, 26.  Dorm 1 was the "trustee's pod," where up to 24 inmates were housed who were pre-screened to ensure they did not have a violent background.  *See id*. at 22, 23.  One officer worked in Dorm 1 per shift.  *See id*. at 23.  K-Pod was a work-release program that housed inmates who were preparing to leave the Jail.  *See id*. at 24, 25.  One officer supervised K-Pod per shift.  *See id*. at 24.  Furthermore, one officer was assigned the Medical Unit per shift.  *See id*. at 26.

At the Jail, light-duty assignments were Central Control and Reception.  *See* Dkt. No. 195 at 29; *see also* Dkt. No. 191-7 at 5.  Correction officers had no contact with inmates while working in Central Control.  *See* Dkt. No. 194 at 16, 18, 85, 154.  Officers in Central Control did not respond to emergencies in the Jail.  *See id*. at 78.  Officers did not bid for Central Control; rather, they were assigned the position at the chart officer's discretion.  *See id*. at 18, 163, 127-128.  Each day, five officers worked in Central Control: two each on the day and evening shifts and one on the overnight shift.  *See id*. at 89.  Correction officers also had no contact with inmates when they worked in Reception.  *See id*. at 16, 19.  Officers in Reception did not respond to emergencies in the Jail.  *See id*. at 78.  Officers did not bid to work in Reception; rather, they were assigned the position.  *See id*. at 19.

### 2. Defendant's light-duty policy

The parties agree that the relevant policy is the "Line of Duty Injuries/Light Task Assignment" (hereinafter, the "Policy") procedure guide.  *See* Dkt. No. 191-7.  However, the parties disagree on how Defendant implemented the Policy.  Defendant, on the one hand, argues that its Policy was not intended to provide light-duty accommodations for employees; rather, it was meant to provide the Sheriff with a tool to force employees who were injured on the job to return to at least light-duty because, pursuant to N.Y. Gen. Mun. Law § 207-c, the County had to pay their full salary regardless of whether they worked.  To the contrary, Plaintiff argues that the Policy allowed only those injured on the job to request light-duty accommodations; and the Sheriff would then, at his discretion, choose whether to assign such duties.

### a. The Policy and testimony presented at trial

The Policy's stated purpose is "[t]o establish procedure concerning employee's (sic) injured in the line of duty and light task assignments."  *See* Dkt. No. 191-7 at 2.  Furthermore, the Policy provides that "[i]t is the policy of the Ulster County Sheriff's Office . . . to provide, whenever practicable, light duty task assignments for injured employees capable of performing such tasks."  *See id*.  In the section discussing line-of-duty injury status leave, the Policy explains that,

> [i]n a case where an employee is on line of duty injury status leave or authorized sick leave and that employee is injured or recovering from injury and the extent of the injury would prevent the employee from performing full duty status assignments, whenever possible, the employee may be required to perform light task assignments.

*See id*. at 5.

The Policy continues under the heading "LIGHT TASK ASSIGNMENTS" to state that, "[i]f it is determined, by physical examination, that a Corrections Officer is able to perform 'Light Task' he/she may be ordered to return to work." *See id.*

Moreover, in the letter Undersheriff Fallutico sent to Plaintiff explaining why she would not receive light-duty accommodations, he stated that "Employees are afforded light duty assignments at the Sheriff's discretion for work-related injuries/illnesses only (207-C or Workers Compensation)." *See* Dkt. No. 191-5.

The trial testimony further included the following discussions regarding the light-duty Policy. Sheriff Van Blarcum testified that he had never provided light-duty to any pregnant employees. *See* Dkt. No. 194, Trial Transcript ("TT"), at 66. In explaining why, he stated that "[w]e have line-of-duty policy which covers 207(c) Municipal Law, which only covers duties if you get hurt in the line of duty." *See id.* at 66:23-25-67:1. Sheriff Van Blarcum further testified that the written Policy did not cover people who were on sick leave. *See id.* at 67. Moreover, in explaining why the Policy exists, he testified that, "[i]f somebody is out of work, we have to replace that person. So it's advantageous to the employer to bring somebody back to fill the slot so we don't have to backfill that slot." *See id.* at 70:6-9. Sheriff Van Blarcum also testified that to his knowledge no officer had shown up to work with a temporary injury or illness and was re-assigned to perform only light-duty tasks. *See id.* at 77. In addition, he stated that "[o]ur policy is it's line-of-duty injury, it's 207(c) Municipal Law, and even if you get hurt on our job, we will make accommodations for you. If you can come back light duty, you have to have a doctor's note saying that you can and then we will find that light-duty spot for you. There's no -- anything in our policy about after-duty injuries." *See id.* at 90:18-24. Moreover, the following colloquy took place,

> Mr. Ranni: If it is determined by physical examination that a corrections officer is able to perform light tasks, he/she may be ordered to return to work.
>
> Mr. Van Blarcum: Yes, sir. That's if you are hurt in a line of duty.
>
> Mr. Ranni: Okay. So that wouldn't include people on authorized leave?
>
> Mr. Van Blarcum: It's a line-of-duty policy that if you're out on 207(c), you go to a doctor or our doctor, then, yes, I could order you back.

*See id.* at 101:16-24.

Then, on re-direct, Sheriff Van Blarcum confirmed that the light-duty Policy only applied to those who had been injured in the line of duty. *See id*. at 121.

Sergeant Kerry Winters testified that Defendant did not "make [it] a practice to give people working conditions. When you hurt yourselves, you have sick time." *See id.* at 128:15-17.

Warden (then-Lieutenant) Becker stated that he was unaware of any persons with an off-duty illness or injury being assigned to light-duty posts. *See id.* at 142. He also testified that "the sheriff does not allow off-duty, light-duty injuries to work in the facility." *See id.* at 144:8-9. Furthermore, Warden Becker testified that "this policy is a line-of-duty injury policy. It's not a light-duty policy. So I think everything that pertains here pertains to line-of-duty injuries." *See id.* at 150:3-5. When asked about the line in the Policy that mentioned "authorized sick leave," Warden Becker stated,

> Only way I can explain the authorized sick leave is when somebody is out of work with an injury, with an off-duty injury and they come in to do tasks as in our training officer, on his own time, on his authorized sick time where he's coming in and doing light-duty tasks, that is the only way I can say I can explain that.

*See id.* at 150:24-25-151:1-4.

Lieutenant Ferro testified that he would not assign light-duty posts for Correction Officers who came to work with minor illness because the work-schedule had already been

made.  *See* Dkt. No. 195 at 8, 10.  Further, when asked what "light duty" meant, Lieutenant Ferro explained, "An officer gets injured on the job, he may be able to come back to work with some type of restrictions and then he would be given the -- assigned light-duty posts by the sheriff." *See id.* at 14:20-23.

Undersheriff Fallutico[4] testified that he and the Sherriff "look[ed] at what problems [the disability] could present to the facility and [pregnancy was] not an injury that you [could] judge what's going on."  *See id.* at 27:20-22.  Undersheriff Fallutico also testified that he was unaware of any corrections officers who were assigned light-duty who had non-job related injuries.  *See id.* at 29.  In addition, Undersheriff Fallutico explained that "[t]he sheriff when he took office in 2007 established his policy as far as light duty would only be given to someone who was injured during working hours performing their duties.  And that's the only time light-duty assignments were given." *See id.* at 31:2-6.

### b. Analysis

The testimony from each of the witnesses supports Defendant's interpretation.  In that regard, Sheriff Van Blarcum specifically testified that he was able to order employees to return to work.  *See* Dkt. No. 194 at 101.  Importantly, Plaintiff produced no evidence showing that Defendant had given light-duty assignments to employees injured off-duty, nor did she introduce any evidence contradicting Sheriff Van Blarcum's testimony that the policy entitled him to order employees to work, not grant an accommodation.  The only evidence tending to support Plaintiff's interpretation includes some vague testimony and the ambiguous language of the

---

[4] Undersheriff Fallutico was unavailable to testify at trial; thus counsel introduced parts of his deposition into the record.

Policy itself, which includes a reference to "authorized sick leave." *See* Dkt. No. 191-7 at 5. However, the testimony explaining the policy confirms that it was created to allow Sheriff Van Blarcum to obtain limited production from employees who would receive their entire salary pursuant to § 207-c regardless of whether or not they actually worked.

Therefore, the Court finds that Defendant's policy, as established at trial, operated as follows: Sheriff Van Blarcum could, at his discretion, order an employee on § 207-c leave to return to work if a doctor indicated that the employee was capable of returning with restrictions. In other words, Defendant's Policy did not provide a mechanism for employees to request light-duty assignments; instead, the policy was in place to notify employees who were on § 207-c leave, but capable of returning at least to light duty, that the Sheriff might order them to return to work.

### 3. Plaintiff's requests for light-duty assignments

On July 8, 2008, when Plaintiff was approximately two months' pregnant, she gave Lieutenant Becker a doctor's note that read, "Ann Marie Legg is under my care for pregnancy. Ann Marie is able to work but shouldn't have direct contact with inmates." *See* Dkt. No. 191-4; *see also* Dkt. No. 194 at 30.  On July 9, 2008, Lieutenant Becker advised Plaintiff that the Jail was unable to accommodate her request for a modified work assignment and that if she could not work full-duty, she would have to go out on state disability or use her accrued time-off.  *See* Dkt. No. 194 at 32-33, 157-158.  On July 10, 2008, at Sheriff Van Blarcum's direction, Undersheriff Fallutico wrote a letter to Plaintiff stating that "Employees are afforded light duty assignments at the Sheriff's discretion for work-related injuries/illnesses only (207-C or Worker's Compensation).  Therefore you have the option of being re-evaluated by your attending

physician and returning to work full duty capacity as a Correction Officer or you may utilize accrued time (sick, vacation, personal) and file for NYS Disability benefits (form attached) which will run concurrently with FMLA." *See* Dkt. No. 191-5.  On July 10, 2008, Plaintiff obtained a revised doctor's note stating that she could work without restrictions. *See* Dkt. No. 191-6.

For a brief period of time, Plaintiff was primarily assigned to positions that involved no inmate contact. *See* Dkt. No. 194 at 37-38.  However, in August 2008, Plaintiff was again assigned to work directly with inmates in Dorms 1 and 2, K-Pod and B-Pod. *See id*. at 38. Plaintiff continued to work full duty until November 13, 2008. *See id.* at 49-50.

**B.       Conclusions of law**

The parties agree that PDA disparate impact claims track a tripartite test.  First, the plaintiff must establish a prima facie case by showing that the defendant "uses a particular employment practice that causes a disparate impact on the basis of . . . sex. . . ." 42 U.S.C. § 2000e-2(k)(1)(A)(i).  In turn, the PDA clarifies that the term "'on the basis of sex' include[s] . . . because of or on the basis of pregnancy[.]"  42 U.S.C. § 2000e(k).  Establishing a prima facie case, thus, requires that the plaintiff identify a specific employment practice that causally creates an adverse impact on pregnant employees. *See Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (citations omitted); *see also Lehmuller v. Inc. Vill. of Sag Harbor*, 944 F. Supp. 1087, 1092 (E.D.N.Y. 1996) (stating that, "[t]o establish a prima facie case of disparate impact on the basis of pregnancy, the plaintiff must show that: (1) the defendant engaged in a specific employment practice that had an adverse impact on pregnant employees; and (2) there is a causal link between the challenged employment practice and the adverse impact" (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994, 108 S. Ct. 2777, 2788-89, 101 L. Ed. 2d

827 (1988)).  However, the plaintiff need not prove intentional discrimination to prevail on a disparate impact claim.  *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988).

The second step, if a plaintiff can establish a prima facie case, requires that the defendant establish "that the challenged practice or policy is 'job related for the position in question and consistent with business necessity.'"  *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 161 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338 (2011) (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)).  "If the employer fails to demonstrate a business justification for the policy or practice, . . . then the plaintiffs prevail."  *Id.* (internal citation omitted).  However, "[i]f the employer succeeds in establishing a business justification, . . . the disparate impact claim proceeds to a third stage."  *Id.* (citation omitted).

Finally, at the third step, "the burden of persuasion shifts back to the plaintiffs to establish the availability of an alternative policy or practice that would also satisfy the asserted business necessity, but would do so without producing the disparate effect."  *Id.* (citing 42 U.S.C. § 2000e-2(k)(1)(A)(ii), (C); [*EEOC v.*] *Joe's Stone Crab, Inc.*, 220 F.3d [1263,] 1275 [(11th Cir. 2000)]) (other citation omitted).

### 1. Prima facie case

The PDA, instead of merely recognizing that discrimination on the basis of pregnancy constitutes unlawful sex discrimination under Title VII, provides additional protection to those "women affected by pregnancy, childbirth or related medical conditions" by expressly requiring that employers provide the same treatment of such individuals as provided for "other persons not so affected but similar in their ability or inability to work."  42 U.S.C. § 2000e(k).  As the Supreme Court has recognized, "'[t]he second clause [of the PDA] could not be clearer: it

- 12 -

mandates that pregnant employees "shall be treated the same for all employment-related purposes" as nonpregnant employees *similarly situated with respect to their ability or inability to work."'* *Int'l Union, United Auto., Aerospace & Agricultural Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 204-05 (1991) (emphasis added) (quoting *California Federal Savings and Loan Assn. v. Guerra*, 479 U.S. 272, 297, 107 S. Ct. 683, 698, 93 L. Ed. 2d 613 (1987) (White, J., dissenting)).  "As such, the PDA explicitly alters the analysis to be applied in pregnancy discrimination cases." *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir. 1996).  In that regard, although Title VII generally requires that a plaintiff demonstrate that the employee who received more favorable treatment be similarly situated in all respects, the PDA requires only that the employee be similar in his or her "ability or inability to work."  42 U.S.C. § 2000e(k).  In other words, the PDA makes clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions if the employees' ability or inability to work remains equal.

With that in mind, as discussed above, "[t]o establish a prima facie case of disparate impact on the basis of pregnancy, the plaintiff must show that: (1) the defendant engaged in a specific employment practice that had an adverse impact on pregnant employees; and (2) there is a causal link between the challenged employment practice and the adverse impact." *Lehmuller*, 944 F. Supp. at 1092 (citation omitted).  In other words, the first prong requires that the plaintiff identify a policy that, although neutral, treats pregnant women differently than those similar in their ability or inability to work; the second prong requires that the plaintiff establish that the policy has created an adverse impact on pregnant employees.

With respect to the first prong, Defendant's light duty policy, as established at trial, operated as follows: If an employee who was on § 207(c) leave provided a doctor's note

indicating that he or she were capable, Sheriff Van Blarcum could, at his discretion, order the employee to return to work on a light-duty assignment. That is, Defendant's Policy did not provide a mechanism for employees to request light-duty assignments; instead, the policy was in place to make it clear that the sheriff could order employees on § 207(c) leave, who were capable of returning at least to light duty, to do so.

The result of this policy is that pregnant women will never be afforded light-duty assignments and will instead be forced to use accrued sick, vacation, or personal time if they are no longer able to work full duty. In other words, although pregnant women may be similarly situated to employees injured on-the-job with respect to their inability to work full-duty, those women are denied the ability to work light-duty merely because the source of their temporary disability differs from those employees injured on the job. *See Ensley-Gaines*, 100 F.3d at 1226 (finding that plaintiff had established that pregnant employees were treated differently than others similarly situated, and recognizing that, although the defendant "must continue to pay limited-duty employees regardless of whether they work, such a distinction pertains to the terms of employment, not to an employee's ability or inability to work, as provided in the PDA"); *see also Carney v. Martin Luther Home, Inc.*, 824 F.2d 643, 646 (8th Cir. 1987) (stating that "'[p]regnant women who are able to work must be permitted to work on the same conditions as other employees; and when they are not able to work for medical reasons, they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working'" (quoting [S. Rep. No. 95-331] at 3-4, reprinted in Legislative History at 40-41)). Therefore, the Court finds that Plaintiff has met the first prong of her prima facie case.

With respect to the second prong, Plaintiff "must produce competent evidence which shows that this adverse impact, [denied light-duty assignments], falls disproportionately on

pregnant employees." *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1315 (11th Cir. 1994). In *Armstrong*, for example, the Eleventh Circuit found that the plaintiff had failed to show that the adverse policy, *i.e.*, that nurses would be fired if they refused to treat any patient, had a disparate impact, *i.e.,* termination, on pregnant women because the plaintiff was the only pregnant woman who had ever been terminated for refusing to treat a patient. *See id.*

Similarly, Plaintiff has produced very little direct evidence to support her claim. Indeed, based on the evidence at trial, Plaintiff is the only employee who has ever requested light-duty accommodation on account of pregnancy. Plaintiff, recognizing as much, argues that she need not produce statistics or any other evidence in this case because Defendant "has not extended the light-duty policy to include pregnant women, who are 'similar in their ability or inability to work,' [thus,] this wholesale exclusion establishes [her] prima facie case." *See* Dkt. No. 191 at 22. To the contrary, Defendant contends that failing to present evidence regarding the composition of the workforce, how many people were assigned to light duty, and how many corrections officers were unable to perform their full duty positions during their pregnancy is fatal to her claim. *See* Dkt. No. 192 at 13-14.

In support of her position, Plaintiff relies on *Lynch v. Freeman*, 817 F.2d 380 (6th Cir. 1987). *Lynch* concerned the unsanitary conditions of portable toilets at a construction site and found that "[a]ny employment practice that adversely affects the health of female employees while leaving male employees unaffected has a significantly discriminatory impact." *Id.* at 388. *Lynch* held that "the plaintiff was not required to prove her case by statistics." *Id.* at 387. In sum, the Sixth Circuit found that the plaintiff established a prima facie case because "'all females were placed at a higher risk of urinary tract infections by using unsanitary portable toilets or by avoiding the use of such toilets and holding their urine[,]'" and "men were not exposed to the

same risks from using the toilets because of 'anatomical differences between the sexes.'" *Id*. at 388.

Plaintiff also cites, *Bradley v. Pizzaco of Nebraska, Inc.*, 939 F.2d 610 (8th Cir. 1991), which held that the plaintiff had proved his prima facie case "[t]hrough expert medical testimony and studies," because the defendant's "policy necessarily excludes black males from the company's work force at a substantially higher rate than white males." *Id*. at 612. *Bradley* involved a black male's challenge to the defendant's no-beard policy. The plaintiff argued that it was impossible for individuals suffering from "pseudofolliculitis barbae (PFB), a skin disorder affecting almost half of all black males," to conform with the policy. *Id*. at 613 (stating that "PFB prevents a sizable segment of the black male population from appearing clean-shaven, but does not similarly affect white males"). The Eighth Circuit reasoned that, because PFB affects a large number of black males but almost no white males, the policy could have a disparate impact based on race. *See id*. The court went on to hold that "a case can be made under Title VII by proving a specific hiring practice has a disparate impact, 'notwithstanding the bottom-line racial balance in [the employer's] workforce.'" *Id*. (quotation omitted).

Moreover, Plaintiff cites *James v. Nat'l R.R. Passenger Corp.*, No. 02 Civ. 3915, 2005 WL 6182322 (S.D.N.Y. Mar. 28, 2005), wherein the district court found that the plaintiff had successfully proven a prima facie case without the need for statistical evidence where the defendant only provided unsanitary unisex bathrooms and the plaintiff was the only woman. *See id*. at *5. The court explained that

> [a] jury could have reasonably concluded that any woman needing to use comfort facilities at Hunter Yard would be subject to the same "impact" as was plaintiff, namely: (i) an egregious lack of privacy; (ii) potential disciplinary action for using alternate facilities; and (iii) unsanitary conditions. Although men were certainly subject to these same conditions, the jury could have reasonably concluded that

> plaintiff and similarly situated women were affected to a greater degree than were
> men, and not because of mere "personality differences" between the sexes

*Id.* (internal citation omitted).

Finally, Plaintiff cites *Germain v. Cty. of Suffolk*, No. 07-CV-2523, 2009 WL 1514513 (E.D.N.Y. May 29, 2009), which dealt with a substantially similar policy as the one at issue in this litigation.  In *Germain*, the court found that the plaintiff had made her prima facie case because "[i]t [was] undisputed that, under the [defendant's] policy, a pregnant officer unable to perform full-duty because of her pregnancy could never be eligible for a light-duty assignment." *Id.* at *4.  Thus, the court concluded that, "although the pregnant officer and the non-pregnant officer are similarly situated in their inability to perform full-duty, the distinction the [defendant's] policy draws between occupational and non-occupational injuries necessarily excludes pregnant women from light-duty."  *Id.*

In addition to the cases that Plaintiff cites, *Lehmuller v. Inc. Vill. of Sag Harbor*, 944 F. Supp. 1087 (E.D.N.Y. 1996), is analogous.  *Lehmuller* involved a defendant's policy where "[o]fficers injured in the line of duty who are unable to conduct their patrol duties, but who can perform routine clerical tasks, [were] required to report for duty at headquarters as their physical condition permit[ed]."  *Id.* at 1089.  The court, without any analysis, concluded that the plaintiff had "shown that the [defendant had] adopted a light-duty policy that ha[d] an adverse impact on pregnant officers and, therefore, ha[d] established a prima facie case of disparate impact discrimination."  *Id.* at 1092.  The court, although not saying as much, apparently did not view it as a problem that the plaintiff was the first pregnant person to request light-duty under the policy. *See id.* at 1089.

Based on the foregoing, the Court finds that Plaintiff has failed to establish the second prong of her prima facie case.  What distinguishes this case from the sanitary bathroom cases

cited above is that in those cases the courts relied on substantive evidence showing that exposure to unsanitary bathrooms (the adverse policy) disproportionately impacted women. *See Lynch*, 827 F.2d at 388; *James*, 2005 WL 6182322, at *5. Thus, the plaintiffs in those cases, through evidence, successfully connected the impact of the unsanitary working conditions to the immutable characteristics of the plaintiffs. Likewise, in *Bradley*, the court found that the plaintiff had established a prima facie case because he established through evidence that individuals afflicted with PFB, a condition that only affects black males, could not comply with the no-beard policy. *See Bradley*, 939 F.2d at 612.

The same connections cannot be made here. What is absolutely lacking in this case is any evidence indicating that pregnant women were *unable* to perform full-duty at the Jail.[5] To the contrary, Plaintiff and two other women worked full-duty until late in their pregnancies. There was simply no evidence that Defendant's Policy actually had an impact on pregnant women the same way that the policies in *Lynch*, *James*, and *Bradley* had an impact on women and black males.[6]

Plaintiff's argument that she has established her *prima facie* case because Defendant's Policy is in effect a "wholesale exclusion" of pregnant employees misses the point. Plaintiff's position would require the Court to assume that pregnant women are inherently incapable of

---

[5] Although Plaintiff did receive a doctor's note stating that she should not have inmate contact, *see* Dkt. No. 191-4, the value of that note is nominal because just two days later the same doctor claimed that she could work full duty, *see* Dkt. No. 191-6.

[6] The Court, further, disregards *Germain* and *Lehmuller* because, to the extent that their holdings are contrary, those cases provided no indication about what evidence the plaintiffs presented to support their cases.

working full-duty.  However, there was no evidence presented at trial that supports this conclusion. [7]

That is not to say, however, that Defendant's policy is not vulnerable to a disparate impact claim.  For example, although Plaintiff elicited testimony that the other two women who were pregnant had to use accrued sick leave around the seventh month of their pregnancies, she failed to connect those women's choice to take sick leave to Defendant's Policy.  Plaintiff provided no evidence showing that these women were capable of performing light-duty assignments but made the choice to take accrued leave because they knew they would not be provided an accommodation.  Furthermore, Plaintiff did not present any evidence to show that, before Defendant implemented its restriction on light duty assignments, pregnant women had used light duty in statistically higher proportions, compared to their total numbers on Defendant's staff.[8]  Moreover, Plaintiff might have, but did not, offer any evidence showing that pregnant women would be more susceptible to injuries in full-duty because of their pregnancy.

In essence, finding in favor of Plaintiff would require the Court to conclude that Defendant's policy of not providing light-duty assignments impacts pregnant women *per se*. However, facts (not necessarily statistics) must be established to show that the complained-of

---

[7] For example, although concerning a disparate treatment claim, in *Young*, the plaintiff presented evidence from her doctor that she "should not lift more than 20 pounds during the first 20 weeks of her pregnancy or more than 10 pounds thereafter."  *See Young*, 135 S. Ct. at 1344 (citation omitted).  Here, to the contrary, Plaintiff presented no evidence that she was incapable of performing full duty because of her pregnancy.

[8] In that regard, the only evidence that Plaintiff adduced at trial that tended to support her position was her testimony that she was afforded light-duty assignments during her first pregnancy in 2004; but, under the new policy, she could no longer receive such assignments. *See* Dkt. No. 194 at 4-5.  However, this evidence alone is simply insufficient to show that Defendant's policy had a disparate impact on pregnant employees.  *See, e.g., Armstrong*, 33 F.3d at 1315.

policy disproportionately impacts pregnant women.  *See, e.g., Armstrong*, 33 F.3d at 1315.[9]  It

was Plaintiff's burden to prove at trial that pregnant women could not work full duty and needed

light-duty assignments but were denied them while others similar in their inability to work full-

duty could receive light-duty assignments.  In other words, Plaintiff's disparate impact claim fails

for lack of evidence.  Accordingly, the Court finds that Plaintiff has failed to establish a prima

facie case and, therefore, dismisses her disparate impact claim.


## IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions, and the applicable

law, and for the above stated reasons, the Court hereby

---

[9] *Armstrong* involved a policy requiring nurses to treat, without exception, those patients to
whom they were assigned.  The plaintiff in *Armstrong* challenged this policy claiming that it
would disproportionately cause the terminations of pregnant employees.  The court disagreed
and reasoned that,

> [t]o satisfy the second element of her *prima facie* case, Armstrong must produce
> competent evidence which shows that this adverse impact, termination, falls
> disproportionately on pregnant employees.  It is the second element that
> Armstrong cannot establish.  Only two employees have resigned or been
> terminated under the HCS policy at issue.  Armstrong is one of the two.  The
> other was a non-pregnant nurse who also refused to see an HIV-positive patient.
> No other evidence related to termination has been produced.  On this evidence, it
> appears the policy does not have a disproportionate impact on pregnant
> employees.

*Armstrong*, 33 F.3d at 1315.

The same is true here; Plaintiff simply has failed to produce evidence that Defendant's policy had
a disproportionate impact on pregnant employees.

**ORDERS** that Plaintiff Legg's disparate impact claim pursuant to 42 U.S.C. § 2000e(k)

is **DISMISSED**.

**IT IS SO ORDERED.**

Dated: July 27, 2017
        Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge