**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ANN MARIE LEGG, NANCY REYES, and**
**PATRICIA WATSON,**

                              **Plaintiffs,**

              **v.**                                          **1:09-CV-550**
                                                              **(FJS/RFT)**

**ULSTER COUNTY; PAUL J. VANBLARCUM,**
in his official capacity as Sheriff of the County of
Ulster and individually; **RICHARD BOCKELMANN,**
in his official capacity as Sheriff of the County of Ulster
and individually; **BRADFORD EBEL,** in his official
capacity as Superintendent of the Ulster County Jail and
individually; and **RAY ACEVEDO,** in his official capacity
as Deputy Superintendent of Ulster County Jail and
individually,

                              **Defendants.**
_____

**APPEARANCES**                              **OF COUNSEL**

**KLAPROTH LAW PLLC**                        **BRENDAN J. KLAPROTH, ESQ.**
406 5th Street, NW
Suite 350
Washington, D.C. 20001
Attorneys for Plaintiffs

**RANNI LAW FIRM**                           **JOSEPH J. RANNI, ESQ.**
148 North Main Street
Florida, New York 10921
Attorneys for Plaintiffs

**BERGSTEIN & ULRICH, LLP**          **STEPHEN BERGSTEIN, ESQ.**
5 Paradies Lane
New Paltz, New York 12561
Attorneys for Plaintiffs

**ROEMER WALLENS GOLD &**          **EARL T. REDDING, ESQ.**
**MINEAUX LLP**          **MATTHEW J. KELLY, ESQ.**
13 Columbia Circle
Albany, New York 12203
Attorneys for Defendants

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Pending before the Court is Defendant Ulster County's motion for judgment as a matter of law or, in the alternative, for a new trial with regard to Plaintiff Watson's hostile work environment claims.  *See* Dkt. No. 138.[1]

### II. BACKGROUND

Plaintiff Watson and three other female corrections officers at the Ulster County Jail filed this lawsuit on May 11, 2009, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), New York State Human Rights Law ("NYSHRL"), and 42 U.S.C. § 1983.

On January 7, 2011, Defendants filed a motion for summary judgment, arguing that Plaintiffs' claims failed for various reasons.  *See* Dkt. No. 29.  In a Memorandum-Decision and

---

[1] Defendant has effectively filed two briefs regarding this motion.  *See* Dkt. Nos. 121, 138. However, the Court has only considered Defendant's most recent brief, *see* Dkt. No. 138, filed in accordance with the Court's May 31, 2015 Text Order.

Order dated November 21, 2013, the Court dismissed several of Plaintiffs' claims. However, the Court determined that a trial was necessary to adjudicate, among others, Plaintiff Watson's Title VII hostile work environment claim against Defendant County and her § 1983 hostile work environment claim against Defendant County. *See generally* Dkt. No. 55.

After Plaintiffs presented their case-in-chief, Defendants moved for a directed verdict on several of Plaintiffs' claims, including Plaintiff Watson's hostile work environment claims. Defendants' counsel generally argued that "the proof ha[d] been insufficient to set forth the prima facie case[.]" *See* Dkt. No. 137-8 at 602:16-17. The Court reserved its decision on the hostile work environment claims. The jury then returned a verdict on August 19, 2014, finding no cause of action for all of Plaintiffs' remaining claims with the exception of Plaintiff Watson's Title VII and § 1983 hostile work environment claims. *See* Dkt. No. 98. The jury awarded Plaintiff Watson $200,000 in compensatory damages for her Title VII claim and $200,000 in compensatory damages for her § 1983 claim. *See id.*

After the Court excused the jury, the Court discussed post-trial motions with counsel. The Court averred that it would give the parties two weeks after the date that the trial record was prepared to file their post-trial motions. *See* Dkt. No. 166 at 71. The Court entered judgment on August 20, 2014. *See* Dkt. No. 102.

Defendant[2] originally filed its motion for judgment as a matter of law or, in the alternative, for a new trial regarding Plaintiff's hostile work environment claims on November 5, 2014. *See* Dkt. No. 121. However, pursuant to Rule 50(b) and Rule 59(b), these motions had to be filed no later than 28 days after the entry of judgment. *See* Fed. R. Civ. P. 50(b), 59(b). The

---

[2] The term "Defendant" when used alone refers exclusively to Ulster County, and the term "Plaintiff" when used alone refers exclusively to Ms. Watson.

Court noted that, "[g]enerally, a court may extend the time to act for good cause; however, Rule 6(b)(2) of the Federal Rules of Civil Procedure explicitly provides that '[a] court **must not** extend the time to act under **Rules 50(b)** and (d), 52(b), **59(b), (d), and (e)**, and 60(b).'" *See* Dkt. No. 122 at 2 (quoting Fed. R. Civ. P. 6(b)(2) (emphasis added)). Thus, on November 6, 2014, before Plaintiff responded to Defendant's motion, the Court denied Defendant's motion as untimely because it was filed beyond the 28-day window.

On the same day, November 6, 2014, Defendant filed a letter motion asking the Court to reconsider its decision to deny its Rule 50/59 motion as untimely. *See* Dkt. No. 123. For support, Defendant argued that the Court had previously granted its request to delay filing post-trial motions until two-weeks after the parties had received the trial record. *See id.* Further, Defendant's attorney stated that he had received the trial transcript on October 22, 2014, and filed the motion less than two-weeks after that. *See id.*

The Court denied Defendant's motion for reconsideration. *See* Dkt. No. 124. In doing so, the Court reasoned that "Rule 6(b)(2) renders the deadlines for filing motions pursuant to Rule 50(b) and Rule 59(b) jurisdictional. Therefore, the Court lacked the authority to extend those deadlines." *See id.* at 2 (citations omitted). Thus, "[t]he fact that the Court instructed Defendants that they had two weeks from the time they received the trial transcript to file their post trial motions did not change the fact that, under Rules 50(b) and 59(b), Defendants were required to file any such motions '[]no later than 28 days after the entry of judgment . . . .'" *See id.* (quoting Fed. R. Civ. P. 50(b)).

Defendant appealed this Court's ruling to the Second Circuit. *See* Dkt. No. 127. In reversing this Court's decision, the Second Circuit first explained that "[a] time limitation is jurisdictional only if it is prescribed by statute." *Legg v. Ulster Cty.*, 820 F.3d 67, 78 (2d Cir.

2016).  However, "procedural rules which have no statutory analogue, although 'mandatory' in the sense that a party may insist upon their enforcement, do not affect the power of the courts and are subject to waiver or equitable exception." *Id*. at 78-79 (citation omitted).  The Second Circuit concluded that Rule 6(b)(2) was not jurisdictional.  *See id.* at 79 (citations omitted).  Accordingly, the Second Circuit held that, "even though the district court was without authority to grant an extension under Rule 6(b)(2), it retained the power to consider whether the plaintiffs had waived compliance with the rule or whether an equitable exception applied." *Id*. (citation omitted).  Thus, the Second Circuit remanded the case to this Court with instructions to consider "whether the plaintiffs waived objection to the court's improper grant of an extension of time or whether an equitable exception to the prohibition of such extensions applied on the facts of this case." *Id*.

After reviewing the Second Circuit's decision, this Court held a conference with counsel and directed the parties to submit briefs regarding the waiver/equitable exception issue and the merits of the underlying motion.  The parties did so, *see* Dkt. Nos. 136, 138; and each filed a reply brief, *see* Dkt. Nos. 170, 172.

## III. DISCUSSION

### A.    Waiver

With respect to waiver, the important consideration is axiomatically whether the opposing party timely objected to the motion.  *See Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009) (stating that the plaintiff "never objected to the timeliness of [the defendant's] Rule 50(b) motion for summary judgment before the district court[; a]ccordingly,

[the plaintiff] has forfeited its untimeliness objection"); *see also Dill v. Gen. Am. Life Ins. Co.*, 525 F.3d 612, 618 (8th Cir. 2008) (stating that the timeliness requirements in Rule 50(b) and 6(b) "may be forfeited if they are not timely raised" (citations omitted)). Therefore, the Court must consider "whether [Plaintiff] timely raised the untimeliness of [Defendant]'s Rule 50(b) [and Rule 59] motion[s]. If [s]he did, [s]he is 'assure[d] relief.'" *Dill*, 525 F.3d at 618-19 (quoting *Eberhart*, 546 U.S. at 19, 126 S. Ct. 403). On the other hand, if Plaintiff "'wait[ed] too long to raise the point,' . . . as [Defendant] asserts, the defense was forfeited. . . ." *Id.* (quoting *Kontrick*, 540 U.S. at 456, 124 S. Ct. 906); *see also Wilburn v. Robinson*, 480 F.3d 1140, 1147 (D.C. Cir. 2007) (stating that "[a] party indisputably forfeits a timeliness objection based on a claim-processing rule if he raises the issue after the court has issued a merits decision"). Indisputably, Plaintiff is objecting to Defendant's untimely motion for the first time in this filing. Thus, the Court must determine whether Plaintiff, having waited until now to object, has waived her objection.

The common principle in the above-cited cases is that whether a party has waived its objection to the timeliness of an opposing party's motion turns on whether that party has objected before the court rules on the underlying motion. *See Dill*, 525 F.3d at 618; *see also Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 476 (6th Cir. 2007) (finding that the party forfeited its timeliness argument because it raised that argument for the first time on appeal). Similarly, in *Advanced Bodycare*, the court held that the defendant had waived its right to object to an untimely Rule 50/59 motion because the defendant had failed to do so until after the district court issued a decision disposing of the motion. *See Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*, 615 F.3d 1352, 1359 n.15 (11th Cir. 2010). In this case, the Court dismissed Defendant's Rule 50 and Rule 59 motion before Plaintiff objected; thus, it would follow that

Plaintiff waived her right to object to Defendant's untimely motion.[3]  *See, e.g, Knox v. Countrywide Bank*, 673 F. App'x 31, 33 (2d Cir. 2016) (summary order) (finding that the defendant had waived its untimeliness argument because it did not make any such argument).

Admittedly, this case is in a unique procedural posture.  It is unlike *Dill* because Plaintiff never had an opportunity to object in her opposition papers to Defendant's original motion.  It is also unlike *Advanced Bodycare* because the Court did not rule on the merits of the motion but rather dismissed it on timeliness grounds before Plaintiff could respond.  However, based on the circumstances of this case, the Court finds that Plaintiff constructively waived her right to object as soon as the Court issued an Order dismissing the motion (regardless of whether she had a chance to do so).  *See e.g., Advanced Bodycare*, 615 F.3d at 1359.  Accordingly, the Court will consider Defendant's motion.[4]

**B.      Defendant's Rule 50 and Rule 59 motions**

*1. Standard of review*

In considering a motion for judgment as a matter of law, a court "*must draw all reasonable inferences in favor of the non moving party, and it may not make credibility*

---

[3] Plaintiff argues, generally, that, because the Court never ruled on the *merits* of Defendant's motion but instead disposed of it on procedural grounds, she never waived her timeliness objection.  However, a clearer cut-off point is simply whether the court has rendered a decision on the underlying motion, regardless of the reason for its disposition.

[4] Arguably, finding that Plaintiff waived her objection to the untimely filing is a harsh result in this case because she was never afforded an opportunity to object.  However, the Court will not speculate on whether Plaintiff would have so objected had she been given a chance to do so.  Moreover, finding in Plaintiff's favor would produce an equally harsh result because Defendant detrimentally relied on the Court's representation that it had two weeks after it received the trial transcript to file its post-trial motions.  Thus, on balance, the appropriate outcome in this case is for the Court to consider the motion's merits.

*determinations or weigh the evidence*.'. . ." *Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir.

2007) (quoting *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150[], 120 S. Ct. 2097, 147 L. Ed.

2d 105 (2000) (emphasis [added])).  "'Credibility determinations, the weighing of the evidence,

and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"

*Id*. (quotation omitted).  Moreover, a court "*must disregard all evidence favorable to the moving*

*party that the jury is not required to believe*." *Id*. (quotation omitted).  In sum, a court may grant

a motion for judgment as a matter of law "'only if it can conclude that, with credibility

assessments made against the moving party and all inferences drawn against the moving party, a

reasonable juror would have been *compelled* to accept the view of the moving party.'"  *Id*. at 370-

71 (quoting *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993) (emphasis added)).  Accordingly, a

court must not set aside a judgment unless

> "(1) there is such a complete absence of evidence supporting the verdict that the
> jury's findings could only have been the result of sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of the movant that
> reasonable and fair minded [persons] could not arrive at a verdict against [it]."

*Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004) (quotation omitted).

Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure provides that "[t]he court may,

on motion, grant a new trial on all or some of the issues – and to any party – as follows: (A) after

a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in

federal court[.]"  Fed. R. Civ. P. 59(a)(1)(A).  As a general matter, "[a] motion for a new trial

should be granted when, in the opinion of the district court, 'the jury has reached a seriously

erroneous result or . . . the verdict is a miscarriage of justice.'"  *Song v. Ives Labs., Inc.*, 957 F.2d

1041, 1047 (2d Cir. 1992) (quotation and other citations omitted).  A court may grant a new trial,

"therefore, when the jury's verdict is against the weight of the evidence." *DLC Mgmt. Corp. v.*

*Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (citations omitted).

The standards governing a Rule 59 motion for a new trial on the ground that the verdict was against the weight of the evidence differs in two important ways from the standards governing a Rule 50 motion for judgment as a matter of law. "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." *Id.* Additionally, a court "is free to weigh the evidence . . ., and need not view it in the light most favorable to the verdict winner." *See id.* (citation omitted). Nonetheless, a court should only grant a Rule 59 motion when the jury's verdict is "'egregious.'" *Id.* (citation omitted). "Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility." *Id.* (citations omitted).

### 2. Hostile work environment -- Title VII and § 1983[5]

#### a. Plaintiff's hostile work environment

"'[T]o establish a hostile work environment claim under Title VII [or § 1983], a plaintiff must produce enough evidence to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'" *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (quotation and footnote omitted). In that regard, a plaintiff must show "both 'objective and subjective elements: the misconduct shown must be "severe or pervasive enough to create an objectively hostile or abusive work

---

[5] Although the standards for whether a hostile work environment exists are the same for claims pursuant to Title VII and § 1983, *see Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006), the rules regarding whether such an environment may be imputed to the employer differ markedly under Title VII and § 1983. Thus, the following discussion will first consider whether a hostile work environment exists and then whether it may be imputed to Defendant under both Title VII and § 1983.

environment," and the victim must also subjectively perceive that environment to be abusive.'"
*Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (quotation omitted). Furthermore, when
evaluating a hostile work environment claim, courts "'examin[e] the totality of the circumstances,
including: the frequency of the discriminatory conduct; its severity; whether it is physically
threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes
with the victim's [job] performance.'" *Rivera*, 743 F.3d at 20 (quoting *Hayut v. State Univ. of
N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003)). "'As a general rule, incidents must be more than
"episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."'"
*Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (quoting *Alfano*, 294 F.3d at 374 (quoting
*Perry*, 115 F.3d at 149)).

> In *Terry*, the Second Circuit advised that,
>
> > [w]hile the standard for establishing a hostile work environment is high, we have
> > repeatedly cautioned against setting the bar too high, noting that "while a mild,
> > isolated incident does not make a work environment hostile, the test is whether
> > 'the harassment is of such quality or quantity that a reasonable employee would
> > find the conditions of her employment *altered for the worse*.'" . . . The
> > environment need not be "unendurable" or "intolerable." Nor must the victim's
> > "psychological well-being" be damaged. . . . "'In short, the fact that the law
> > requires harassment to be severe or pervasive before it can be actionable does not
> > mean that employers are free from liability in all but the most egregious cases.'" . .
> > .

*Id.* (internal quotations omitted).

Furthermore, *Terry* explicitly instructed that a plaintiff need not show that each incident on its
own was severe, because "'a work environment may be actionable if the conduct there is *either*
so severe *or* so pervasive as to alter the working conditions of a reasonable employee.'" *Id.* at
149 (quoting *Richardson*, 180 F.3d at 440). To that extent, the complained of conduct need not
"be both severe *and* pervasive to be actionable under a hostile work environment theory[.]" *Id.*

- 10 -

With these standard in mind, the Court's first task is to lay-out the factual basis for Plaintiff's claims as described in her trial testimony.

*Magazines and screensavers*. Plaintiff stated that, "[f]rom the day that I started working in the jail, pornography, magazines -- Playboy, Hustler, Maxim -- they were all over the jail." *See* Dkt. No. 137-8 at 547:22-24. Furthermore, Plaintiff testified that "[t]here were magazines in the drawers that were being looked at, there were screen savers on these supervisors' computers in their offices[.]" *See id.* at 546:7-9. Specifically, Plaintiff testified that "Corporal Statenburg [who was] in charge of the in-take department had a screen saver of a woman with just a black sash going across her chest and her vagina area. Corporal Wranovics also had a screen saver of a half-naked woman on his computer in his own office." *See id.* at 549:9-13. Moreover, Divorl "would take [pornographic] magazines out and as he looked through them, he would comment on the women in those magazines. Talking about their breasts, what he would like to do with them." *See id.* at 552:25-553:1-3. Plaintiff testified that Divorl did this "on more than one occasion." *See id.* at 553:4. Finally, Plaintiff testified that, although supervisors in the jail at one time removed the magazines, they would return. *See id.* at 562.

*Sexual comments*. Plaintiff testified that, "[o]n one occasion, Officer Hedrick would make reference to the size of my chest[.]" *See id.* at 546:16-19. Moreover, she stated that other officers "would make references to my butt, they would make references to my chest and what they would like to do sexually." *See id.* at 549:4-6.

*Divorl*. Plaintiff testified that, in 2005,[6] when she started to work in-take she expressed to Corporal Ferro and others that she "couldn't work with [Divorl], he made me feel very

_____

[6] Defendant makes a cursory argument that the Court cannot consider Divorl's 2005 conduct because it occurred beyond Title VII's 300-day statute of limitations. To the contrary, Plaintiff

uncomfortable the way he would look at me, the way he would watch me, and I asked and I expressed many times please don't do that. I cannot work with him." *See id*. at 550:1-5. Furthermore, she testified that, during training in 2005, Divorl "would come up behind me, put his hand around my -- around my chair and have his head right next to mine, breathing down my neck continuously and he would come up behind me all the time." *See id*. at 550:7-11. Plaintiff asserted that she "asked him to stop, it didn't stop. I said something to Corporal Ferro and he said he talked to [Divorl] and he said that he was training and he needed to watch you[.]" *See id.* at 550:11-14. Moreover, in February 2007, Plaintiff again reiterated to co-workers that she did not want to work alone with Divorl. *See id.* at 557. In addition, Plaintiff described the following interaction that took place in October 2007:

> Divorl brought in a chair, a massaging chair. He asked me if I wanted to sit in that chair and I said no. So he sat in the chair. As he sat in the chair, he kept moaning and he kept saying, "Oh, I can feel my balls vibrating." At that point I got up and I left the in-take area because I couldn't be with him.

*See id.* at 550:18-23.

Plaintiff testified that she reported this interaction to Corporal Toolan who told Sergeant Polacco who then brought it to Lieutenant Becker. *See id.* at 551. Plaintiff then had a meeting with Lieutenant Becker, Sergeant Polacco, and Divorl. *See id.* She described the meeting as follows:

---

contends "[c]laims for a hostile work environment . . . may properly include acts outside the 300-day period '[p]rovided that an act contributing to the claim occurs within the filing period[.]'" *Trinidad v. N.Y. City Dep't of Correction*, 423 F. Supp. 2d 151, 165 (S.D.N.Y. 2006) (quotation and other citations omitted). As the Court previously discussed, "[a] plaintiff, . . . may base her hostile work environment claim on events outside the limitations period as long as (1) the acts occurring before the 300-day period expired are 'part of the same actionable hostile work environment practice,' and (2) at least one act contributing to the claim occurs within the limitations period." *See* Dkt. No. 55 at 6-7 (quoting [*Natl. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101,] 120 [(2002)]). The Court finds that the 2005 incidents are part of the same actionable hostile work environment as the events that took place during the limitations period; and, therefore, it will consider the 2005 events when deciding whether a hostile work environment exists.

> Lieutenant Becker asked me what happened, I told him the story, at which point he handed me a letter and he asked me -- he said, "What do you want me to do with him? Do you want him fired?" I said, "I -- I can't do that. I don't want him fired, I don't want any repercussions for his wife and his child. No, I don't want him fired but I can't do that. I don't have the power to do that." He had a letter already drafted on his desk and said, "So this matter is resolved? You don't want him fired?" I really didn't think I had a choice. They're all sitting there. He had me in a room by myself. I had nobody else with me. I didn't know what I was going into. I had no idea. The letter was already done. So I signed the letter.

*See id.* at 551:12-25.

On cross-examination, Plaintiff later explained that she felt "intimidated" at this meeting. *See id.* at 558:14, 19; 567:11, 23. Plaintiff testified that she left the meeting crying. *See id.* at 568. After this meeting, "on rare occasions" Plaintiff would have to work with Divorl until he was eventually taken off in-take because of an argument with another officer. *See id.* at 552. According to Plaintiff, no one ever followed up with her after her meeting with Lieutenant Becker. *See id.*

*Plaintiff's mental state*. Plaintiff testified that she found "the comments, the magazines, the physical conduct" offensive. *See id.* at 554:1-4. Moreover, Plaintiff testified that, after she began to work with Divorl "five nights a week, [she] began to withdraw from [her] life, [her] children. [She] began having marital issues because [she] couldn't talk to [her] husband. [She] became very depressed, very anxious, and [she] had a hard time going to -- day-to-day life and [she] hated coming to work." *See id.* at 554:10-15.

In addition to Plaintiff's testimony, former-Plaintiffs Reyes and Legg corroborated Plaintiff's account regarding the pornography and sexually explicit screen savers. *See id.* at 100-01; 505-10.

Viewing the totality of the evidence, the jury could have fairly concluded that Plaintiff was consistently exposed to offensive pornographic materials and screensavers as well as

inappropriate comments describing these images.  The pervasiveness of the illicit material in the jail, although insufficient in and of itself to establish a hostile work environment, counsels in favor of finding that a hostile work environment existed.  Furthermore, Plaintiff was subjected to several sexually offensive encounters with Divorl.  First, Plaintiff testified that Divorl would comment about her physical features in a suggestive way.  Second, Plaintiff had to hear Divorl describe the pornographic images that he was viewing in front of her.  Finally, Divorl commented that he "could feel his balls vibrating" while seated on a massage chair.  These comments and actions have obvious sexual overtones and are both objectively and subjectively offensive.  Furthermore, Plaintiff complained that Divorl came up behind her and breathed down her neck and would always stare at her and make her feel very uncomfortable.  Although these incidents are not obviously sexually based, the Court may still consider them when deciding whether Plaintiff suffered a hostile work environment.

Defendant argues, in essence, that, because former-Plaintiffs Reyes and Legg failed to obtain a favorable jury verdict, the jury must have concluded that the pornographic magazines and screensavers did not contribute to a hostile work environment.  However, Plaintiff presented additional and different evidence from which the jury could have concluded that Plaintiff, but not former-Plaintiffs Legg and Reyes, suffered from a hostile work environment.  In that regard, Plaintiff was the only person who had to suffer Divorl's conduct, and she also had to deal with an intimidating meeting after she complained about Divorl's massage chair comments.[7]  The sum

---

[7] Defendant argues that courts have rejected the argument that "'a failure adequately to remediate sexual harassment itself constitutes an act that may contribute to a hostile work environment.'"  *See* Dkt. No. 138 at 24 (quoting *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 724 (2d Cir. 2010)).  However, the jury could have considered the meeting, not as a failure to mitigate the sexual harassment, but rather as an attempt to strong-arm Plaintiff into rejecting the option to move forward with formal charges and forcing her to confront her harasser in an unsafe environment.

and substance of Plaintiff's evidence was simply more substantial than that of former-Plaintiffs Legg and Reyes.

Moreover, "[t]he Court's task on a Rule 50 motion is not to examine different aspects of the jury's verdict to determine whether they can be logically reconciled with one another." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 546 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016). Instead, the court "is to look at the trial evidence and assess whether that evidence was sufficient to support the verdict." *Id*. (citing Fed. R. Civ. P. 50(a) ("If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment as a matter of law. . . .")) (other citation omitted). Thus, to the extent that Defendant asserts that the verdict was inconsistent, this argument cannot form the basis for the granting of judgment as a matter of law. Based on these well-established standards governing such motions, the Court denies Defendant's motion for judgment as a matter of law because Plaintiff presented sufficient evidence to support the jury's finding.

Unlike Defendant's motion for judgement as a matter of law, a court may grant "'a new trial . . . even if there is substantial evidence supporting the jury's verdict.'" *DLC Mgmt. Corp.*, 163 F.3d at 134. Additionally, a court "is free to weigh the evidence . . ., and need not view it in the light most favorable to the verdict winner." *Id.* (citation omitted). Nonetheless, a court should only grant a Rule 59 "motion when the jury's verdict is 'egregious.'" *Id*. (quotation omitted).

Plaintiff clearly presented sufficient evidence from which a reasonable juror could have concluded that Plaintiff suffered a hostile work environment. In other words, it cannot be said

that the jury's verdict was "egregious."  Therefore, for many of the same reasons as stated above, the Court finds that there is no persuasive reason to grant a new trial with respect to whether Plaintiff suffered a hostile work environment.

Establishing that a hostile work environment exists, however, is only the first step in determining whether the defendant is liable.  The plaintiff must also show that there is reason to impute the existence of the hostile work environment to the defendant.  *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).


### b. Imputing the conduct to the employer – Title VII

"Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior 'culminate[d] in a tangible employment action' against the employee[.]"  *Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004) (quotation omitted).  If so, "'the employer will, *ipso facto*, be vicariously liable[.]'"  *Id.* (quotation omitted).  However, "'when the harassment is attributable to a coworker, rather than a supervisor, . . . the employer will be held liable only for its own negligence.'"  *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998)).  "The Court analyzes whether an employer's remedial actions were sufficient based on the totality of the circumstances."  *Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 454 (E.D.N.Y. 2011). (citation omitted).  In this case, the harassing conduct was attributable to Plaintiff's co-workers,

not her supervisors.[8]  Thus, the Court must consider only whether Defendant's remedial actions were sufficient.

As the Court instructed the jury, "plaintiff must prove by a preponderance of the evidence that the Defendant County failed to provide a reasonable avenue for her complaint or knew, or in the exercise of reasonable cause [sic] should have known, about the hostile work environment and yet failed to take appropriate legal action." *See* Dkt. No. 137-8 at 716:19-25.  Before considering whether Defendant's response was appropriate, it is important to review Defendant's sexual harassment policy.[9]

The policy describes sexual harassment, in pertinent part, as "unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *See* Dkt. No. 137-1 at 2.  Upon receiving a complaint, the internal affairs officer is supposed to "substantiate the complaint" and "determine if [the] victim is willing to settle the matter informally." *See id.* at 3.  Regardless of whether the victim determines to handle the complaint formally or informally, a subsequent review is required. *See id.*  Furthermore, Ulster County's specific policy provides that "[a]ll complaints will be treated seriously and will be investigated promptly." *See id*. at 4.  Moreover, the policy provides that "[a]n attempt to resolve the issue between the involved parties may be made in appropriate cases." *See id*.  In 2006, Ulster County's policy was updated to explain that "[a]ll information provided by complain[ants] of

---

[8] Although Plaintiff alleges that several Corporals had explicit screensavers on their computer screens, there is no evidence that these individuals were "empowered by the employer to take tangible employment actions against the victim," *Vance*, 133 S. Ct. at 2439; thus, they do not qualify as supervisors for the purpose of Plaintiff's Title VII claims.

[9] There are two relevant policies: the Sheriff's policy and Ulster County's policy. *See* Dkt. No. 137-1.

harassment, and the investigations that follow, will be handled with the utmost discretion possible under the circumstances." *See id.* at 7. The investigation is intended to include "questions to the complainant, the alleged harasser, and any witnesses, recognizing that complete confidentially may not be possible." *See id.* After a decision has been made, it must be communicated promptly to the impacted parties. *See id.*

Moving to the factual basis of Plaintiff's claim, there are three groups of facts that the Court should consider separately when determining whether the conduct should be imputed to Defendant. First, there were the 2005 allegations regarding Divorl's conduct during training. Second, there were the general complaints regarding the pornographic magazines and screensavers. Finally, there were Divorl's 2007 comments involving the massage chair.

As described above, Plaintiff complained that, in 2005, Divorl would come up from behind her, breath down her neck, and stare at her. Divorl's actions made Plaintiff feel uncomfortable, and she complained to Corporal Ferro. Corporal Ferro, in turn, told Plaintiff that Divorl was training and that he needed to watch her. Defendant did not rebut Plaintiff's account of her 2005 complaints but rather argued that Divorl's actions in 2005 were not sexual in nature and therefore would not have triggered compliance with the sexual harassment policy. Since Corporal Ferro refused to take any action with regard to Divorl's 2005 actions, the Court finds that sufficient evidence supported the jury's finding that Divorl's 2005 conduct may be imputed to Defendant for purposes of Plaintiff's Title VII claim because Defendant was negligent in responding to Plaintiff's complaints.

With regard to the pornographic magazines and screensavers, Plaintiff testified that as she would complain about the explicit material it would be removed for a short period of time but ultimately come back. Defendant presented no evidence that it sufficiently responded to the

complaints of pornographic materials permeating the jail.  Moreover, Plaintiff testified that it was the corporals and shift supervisors who used the explicit screensavers.  In light of these facts as established at trial, the Court finds that the evidence supported the jury's finding that Defendant failed to respond adequately to complaints that other employees and supervisors viewed pornographic magazines and used explicit screen savers.

Finally, with regard to the massage chair comments, Plaintiff testified that, after she complained to Corporal Toolan, he told Sergeant Polacco, who then relayed that information to Lieutenant Becker.  Lieutenant Becker held a meeting within a week of Plaintiff's complaint to consider her issues with Divorl.  Plaintiff's testimony paints a picture of a meeting where she was intimidated into agreeing that she did not want to pursue a formal complaint and was not given any option between having Divorl fired and proceeding informally.  Furthermore, including Divorl, the alleged harasser, in the meeting to address a sexual harassment complaint appears to have directly contradicted Defendant's own policy of handling claims with "the utmost discretion."  *See* Dkt. No. 137-1 at 7.  A fair review of Defendant's sexual harassment policy shows that, even crediting Lieutenant Becker's testimony, he mishandled the complaint by inviting Divorl to the meeting to discuss Plaintiff's sexual harassment complaint.  Based on Plaintiff's version of this meeting, the Court finds that the jury had a sufficient basis to determine that Defendant failed to respond adequately to Plaintiff's complaint.  Accordingly, the Court denies Defendant's motion for judgment as a matter of law or, alternatively, for new trial on Plaintiff's Title VII hostile work environment claim.

### c. Imputing the conduct to the employer – § 1983

*Monell* does not provide a separate cause of action against a municipal entity; rather, "it *extends* liability to a municipal organization where that organization's [policy, practice, or custom] led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (citations omitted). However, "[b]efore a municipality can be held liable under § 1983, it must be shown to have been 'the moving force of the constitutional violation.'" *Carmichael v. City of New York*, 34 F. Supp. 3d 252, 262-63 (E.D.N.Y. 2014) (quoting *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 690-91, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)) (other citation omitted). In that regard, "to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citation omitted).

"'The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor."'" *Benacquista v. Spratt*, 217 F. Supp. 3d 588, 599 (N.D.N.Y. 2016) (quotation omitted). Importantly, this element "can only be satisfied where a plaintiff proves that a 'municipal policy of some nature caused a constitutional tort.'" *Roe*, 542 F.3d at 36 (quotation omitted). "'In other words, a municipality may not be found liable simply because one of its employees committed a tort.'" *Id.* (quotation omitted).

The Second Circuit has stated that, although "'isolated acts . . . by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify liability,' they can be the basis of liability if 'they were done pursuant to

municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage' of which supervisors must have been aware.'" *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (quoting *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir.2012)). Moreover, "[a] custom or policy of harassment and other discriminatory acts giving rise to hostile work environment claims can form the basis of section 1983 claims." *Id.* (citations omitted). Therefore, the question is "whether there is evidence that 'a policymaking official ordered or ratified the employee's actions -- either expressly or tacitly.'" *Id.* (quotation omitted).

In this case, the Court instructed the jury that

> [a] policy, custom or practice means a persistent, widespread or repetitious course of conduct by public officials or employees that, although not authorized by or which may be contrary to, written law or expressed municipal policy, that is so consistent, pervasive and continuous that the Defendant County's policymakers must have known about it, so that, by their acquiescence, such policy, practice or custom has acquired a force of law without formal adoption of announcement.

*See* Dkt. No. 137-8 at 736:24-737:8.

In sum, to establish an official policy or custom sufficient enough to manifest *Monell* liability, a plaintiff must show one of three things: "(1) the existence of an official policy, . . .; (2) that an official with final policy-making authority took action or made a specific decision that caused the deprivation, . . .; or (3) the deprivation was caused by an unlawful practice amongst subordinate officials that was so widespread as to imply constructive acquiescence by policy-making officials, . . ." *Rogers v. City of New Britain*, 189 F. Supp. 3d 345, 358 (D. Conn. 2016) (internal citations omitted).

Here, Plaintiff does not assert that there was an official policy that caused her discrimination, nor does she assert that an official with final policy-making authority took any

action that discriminated against her.  Rather, Plaintiff relies exclusively on the argument that the unlawful practice among subordinates was so widespread as to imply constructive acquiescence. As with Plaintiff's Title VII claim, her § 1983 claim rests on three unique factual occurrences. As recounted above, those include the general complaints regarding the pornographic magazines and screensavers, the 2005 allegations regarding Divorl's conduct during training, and Divorl's 2007 comments involving the massage chair.

In the first instance, Plaintiff's testimony regarding the pervasiveness of the pornographic material and use of explicit screen savers is sufficient enough that the jury could have concluded that officials at the jail acquiesced to its existence.  On the other hand, the evidence presented at trial was insufficient to prove that Defendant had a policy that authorized Divorl's harassing behavior.[10]  Indeed, the testimony regarding Divorl's harassment focused on two relatively isolated incidents occurring two years apart.  Accordingly, viewing the working environment is viewed in its entirety, the Court finds that, as a matter of law, Plaintiff's § 1983 hostile work environment claim fails because she did not present sufficient evidence that the hostile work environment was a result of a municipal policy or custom.  Accordingly, the Court grants Defendant's motion for judgment as a matter of law with regard to this claim.

C.     **Damages**

Although not stating as much, Defendant is in substance asking the Court for a remittitur. "'A remittitur, in effect, is a statement by the court that it is shocked by the jury's award of

---

[10] Plaintiff argues that a municipal policy is evident because officials at the jail failed to respond properly to her EEOC complaint.  However, Plaintiff presented no evidence at all regarding any alleged harassment occurring after she filed her complaint.  Thus, this cannot be a basis to conclude that there was a municipal policy.

damages[.]'" *Dotson v. City of Syracuse*, No. 5:04-CV-1388, 2011 WL 817499, *13 (N.D.N.Y. Mar. 2, 2011) (quoting *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990)).  Upon granting a motion for remittitur, "a plaintiff [must] choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co., Inc.*, 917 F.2d 1320, 1328 (2d Cir. 1990).  In considering a motion for remittitur, "a district court should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive." *Id*. at 1330.

In this case, the jury awarded Plaintiff $200,000 in compensatory damages with respect to her Title VII claim.  During her testimony, Plaintiff offered the following description of her emotional distress: "After Officer Divorl and I began working together five nights a week, I began to withdraw from my life, my children. I began having marital issues because I couldn't talk to my husband.  I became very depressed, very anxious, and I had a hard time going to day-to-day life and I hated coming to work." *See* Dkt. No. 137-8 at 554:10-15.  Moreover, Plaintiff stated that she was prescribed anti-anxiety medication.  According to Plaintiff, "[t]he medication t[ook] [her] case out of the 'garden variety' category of emotional distress claims." *See* Dkt. No. 136 at 34.

As Plaintiff herself asserts, "'"[s]ignificant" emotional distress claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses."'" *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012) (quotation omitted).  Plaintiff, however, produced only vague testimony regarding her alleged emotional distress.  Importantly, there was no testimony from a medical professional or any other person to corroborate Plaintiff's allegations.  Nor did she establish that the medication she took was

directly related to the hostile work environment she suffered. Thus, none of the quintessential calling cards of a significant emotional distress claim are present in Plaintiff's case.

Furthermore, *MacMillan* presents a factual analogue to this case. In that case, the plaintiff's only testimony regarding his emotional distress was that working with his boss was "horrible," and his daughter provided some "marginally more descriptive testimony" that the plaintiff "was always sad," "wasn't happy anymore" and "wasn't his same self." *Id.* at 561. The *MacMillan* court concluded that "[s]uch evidence, at best, demonstrates 'garden variety' emotional distress." *Id.* After a lengthy discussion of other garden variety emotional distress cases, the court concluded that a new trial concerning damages would be ordered unless the plaintiff agreed to remit his compensatory damage award from $125,000 to $30,000. *See id.* at 563.

In garden variety cases, "the evidence usually is limited to the testimony of the plaintiff, who describes the emotional distress in vague or conclusory terms, presents minimal or no evidence of medical treatment, and offers little detail of the duration, severity, or consequences of the condition." *Reiter v. Metro. Transp. Auth. of N.Y.*, No. 01 CIV. 2762, 2003 WL 22271223, *9 (S.D.N.Y. Sept. 30, 2003) (citations omitted). Based on the sparse evidence Plaintiff presented regarding her emotional distress, the Court concludes that Plaintiff's emotional distress is properly classified as "garden variety."

The cases Plaintiff cites in support of her damages award are inapposite. First, she relies on *Phillips v. Bowen*, 278 F.3d 103 (2d Cir. 2002), where the Second Circuit upheld a jury's award of $400,000. *See id.* at 111. The court described the evidence presented as follows:

> [p]laintiff submitted evidence of ongoing harassment by each defendant over a
> five-year period. Phillips and her boyfriend testified in detail about her emotional
> distress, physical illness, and the effects of defendants' conduct on her lifestyle

and relationships. Phillips' co-workers testified about the deterioration they observed in Phillips. Other less direct indicia of plaintiff's damages came from the defendants themselves, who unapologetically described their treatment of plaintiff.

*Id.* at 111-12.

Plainly, the evidence in *Phillips* was quantitatively and qualitatively greater than what Plaintiff presented in this case. Plaintiff recognizes as much but argues that, because the award was issued more than a decade ago, the Court could consider inflation to conclude that her award is reasonable in light of *Phillips*. *See* Dkt. No. 136 at 35 (citing *DiSorbo v. Hoy*, 343 F.3d 172, 185 (2d Cir. 2003)). *Phillips*, however, was not a garden variety case; therefore, Plaintiff's reliance on *Phillips* is unavailing.

Even so, "a court is not required to remit a large non-economic damage award, even where evidence of emotional damage consists solely of plaintiff's testimony." *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, 746 F. Supp. 2d 575, 601 (S.D.N.Y. 2010) (citation omitted). "However, when a court is convinced that the jury's award is entirely out of proportion to the Plaintiff's injury, and was motivated by sympathy rather than by evidence of harm, remittitur is the appropriate remedy." *Id.* (concluding that the jury felt sorry for the plaintiff and thereby remitted the award of compensatory damages from $1,000,000 to $10,000).

In this case, Plaintiff only testified that she suffered emotional distress on account of Divorl's conduct. She did not attribute any emotional distress to the pornographic magazines or screensavers; nor did she testify that she suffered any emotional injury with respect to Divorl's conduct in 2005. In sum, because the jury's award of $200,000 was clearly excessive, the Court grants Defendant's motion for a new trial with respect to Plaintiff's Title VII claim unless Plaintiff agrees to a remittitur reducing the award to $75,000.

# IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions, and the applicable law, and for the above stated reasons, the Court hereby

**ORDERS** that Defendant's motion for judgement as a matter of law with respect to Plaintiff's Title VII claim, *see* Dkt. No. 138, is **DENIED**; and the Court further

**ORDERS** that Defendant's motion for judgment as a matter of law with respect to Plaintiff's § 1983 claim, *see* Dkt. No. 138, is **GRANTED**; and the Court further

**ORDERS** that Defendant's motion for a new trial with respect to Plaintiff's § 1983 claim, *see* Dkt. No. 138, is **DENIED as moot**; and the Court further

**ORDERS** that Defendant's motion for a new trial with respect to Plaintiff's Title VII claim, *see* Dkt. No. 138, is **GRANTED** unless Plaintiff agrees to a remittitur to **$75,000**. Within **ten days** of the date of this Memorandum-Decision and Order, Plaintiff shall notify the Court and opposing counsel in writing whether she will elect to accept a remittitur that reduces the jury's award to **$75,000.** If Plaintiff accepts the remittitur, the Court will enter judgment accordingly. If Plaintiff rejects the remittitur, the Court will set a date for a new trial regarding Plaintiff's Title VII claim; and the Court further

**ORDERS** that Plaintiffs' motions for attorney's fees and costs, *see* Dkt. Nos. 106, 125, are **DENIED without prejudice to renew, if appropriate,** after the Court enters a final judgment in this case.

**IT IS SO ORDERED.**

Dated: August 24, 2017
      Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge